**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KAISER ALUMINUM WARRICK, LLC,<br><br>                    Plaintiff,<br><br>        -against-<br><br>US MAGNESIUM, LLC,<br><br>                    Defendant. | 22 Civ. _____ (   )<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kaiser Aluminum Warrick, LLC ("Kaiser" or "Purchaser"), by and through its undersigned attorneys, McDermott Will & Emery LLP, brings this complaint against Defendant US Magnesium, LLC ("USMag" or "Seller"), and alleges as follows:

**INTRODUCTION**

1.      This dispute arises out of USMag's breach of its contractual obligations to Kaiser. Pursuant to the parties' Magnesium Supply Agreement (the "MSA") (Ex. A), effective as of October 9, 2020, USMag was to sell certain quantities of pure magnesium to Kaiser at specified prices, beginning in December 2020 and continuing through December 2022.

2.      Kaiser is an indirect wholly-owned subsidiary of Kaiser Aluminum Corporation, a leading producer of semi-fabricated specialty aluminum products, serving customers worldwide with highly-engineered solutions for aerospace and high-strength, packaging, general engineering, custom automotive, and other industrial uses.  Kaiser's products include bare and coated aluminum coil for can stock applications in the beverage and food packaging industry in North America.  Magnesium is an essential component in many of Kaiser's products.

3.      The parties bought and sold magnesium in accordance with the MSA for approximately nine months.  On September 29, 2021, USMag sent Kaiser a declaration of force majeure (the "Force Majeure Declaration") (Ex. B).

4.      The Force Majeure Declaration was vague, blaming the supply disruption on the unanticipated failure of "critical pieces of manufacturing infrastructure."  The Force Majeure Declaration provided no information as to what steps USMag was taking to rectify the failed "manufacturing infrastructure" and no information as to when the failure might be rectified.

5.      In addition, the MSA obligated USMag to maintain a 60-day supply of magnesium (the "safety stock") calculated based on past purchase amounts, for sale to Kaiser in the event of a supply disruption.  However, in communications with Kaiser after the Force Majeure Declaration, USMag took the position that the Force Majeure Declaration excused USMag of its safety stock obligation.

6.      USMag's Force Majeure Declaration and refusal to supply safety stock threatened to disrupt Kaiser's own production schedule, jeopardizing Kaiser's relationships with its customers and creating a risk that Kaiser would have to declare force majeure to its customers.

7.      Accordingly, Kaiser immediately took steps to purchase magnesium from other suppliers, which was at spot market prices significantly higher (on the order of approximately 3x to 6x) than the fixed prices that Kaiser would otherwise pay USMag under the MSA.

8.      Over the course of the months following the Force Majeure Declaration, and despite Kaiser's repeated requests, USMag repeatedly refused to consistently provide basic information as to the nature of the purported mechanical breakdowns that led to the Force Majeure Declaration, the status of the repairs and continuing challenges impacting the repairs,

the magnesium USMag expected to be able to supply, or the timing of anticipated deliveries to Kaiser.

9.      Based on information obtained by Kaiser, it appears that the equipment at issue was poorly maintained, its breakdown foreseeable, and not reasonably beyond USMag's control. Thus, the Force Majeure Declaration was improper.

10.     As of the date of this Complaint, USMag has not completed its repairs and Kaiser is still not receiving quantities set by the MSA.

11.     Kaiser has already suffered damages of approximately $10.1 million as a result of USMag's breaches of the MSA.  These damages continue to accrue.

## PARTIES

12.     Plaintiff Kaiser is a Delaware limited liability company whose sole member is Kaiser Aluminum Fabricated Products, LLC.  The sole member of Kaiser Aluminum Fabricated Products, LLC is Kaiser Aluminum Investments Company, which is a Delaware corporation with its principal place of business in Tennessee.  The parent company and sole shareholder of Kaiser Aluminum Investments Company is Kaiser Aluminum Corporation, which is a publicly traded company.  As noted, Kaiser produces bare and coated aluminum coil for can stock applications in the beverage and food packaging industry in North America.

13.     Defendant USMag is a Delaware limited liability company.  Its sole member is The Renco Group, Inc. ("Renco"), which is incorporated and has its principal place of business in New York.  USMag harvests and processes salts from the Great Salt Lake to produce magnesium and other chemical products.

## JURISDICTION AND VENUE

14.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) as the controversy is between (a) a citizen of Delaware and Tennessee and (b) a citizen of New York, and because Kaiser seeks damages in an amount in excess of $75,000, exclusive of interest and costs.

15.     Personal jurisdiction over Defendant and venue are proper by agreement of the parties.  Specifically, Section 21 of the MSA states that "Any and all disputes between the parties that may arise pursuant to this Contract will be heard and determined before an appropriate arbitrator or state court located in New York, New York or any federal court in the Southern District of New York."

16.     Section 21 of the MSA further states that "Seller acknowledges and agrees that any such court will have the jurisdiction to interpret and enforce the provisions hereof and/or an arbitrators judgment, and the Seller waives any and all objections that it might otherwise have as to personal jurisdiction or venue in any of the above tribunals."

17.     In addition, USMag is a limited liability company and its sole member, Renco, is a citizen of New York.

## FACTUAL ALLEGATIONS

**The Magnesium Supply Agreement**

18.     The MSA was entered into by USMag and Alcoa Warrick LLC effective October 9, 2020.

19.     Kaiser Aluminum Corporation purchased the equity in Alcoa Warrick LLC from Alcoa USA Corp., an indirect wholly-owned subsidiary of Alcoa Corporation, pursuant to a Purchase Agreement dated November 30, 2020.  The transaction closed on March 31, 2021.  Alcoa Warrick LLC was then renamed Kaiser Aluminum Warrick, LLC.

20.     The MSA provides that, for the period of December 1, 2020 to December 31, 2022, USMag would sell certain quantities of pure magnesium ingot (the "Product") to Kaiser at specified prices.

21.     Specifically, the MSA provides for a minimum purchase of 6674 metric tons ("MT") and a maximum purchase of 7526 MT of Product for the period from December 1, 2020 to December 31, 2021, and also for the period from January 1, 2022 to December 31, 2022. (MSA ¶ 2(a)-(b).)  The MSA further provides that the Seller is to schedule its monthly production based on a Monthly Forecast provided by the Purchaser ten days prior to the start of each month.  (MSA ¶ 2(c).)

22.     The MSA also specifies prices of Product from December 1, 2020 to December 31, 2021, and from January 1, 2022 to December 31, 2022.  (MSA ¶ 3(a)-(b).)[1]

23.     The MSA requires Seller to maintain a 60-day supply of safety stock:  "At all times during the term of this Agreement, Seller shall carry a safety stock of sixty (60) days of Purchaser's average consumption."  (MSA ¶ 2(d).)  The purpose of the safety stock provision is to ensure a steady and reliable supply of Product for at last 60 days in the event that supply is interrupted for any reason.

24.     The MSA also contains a force majeure clause, which states:

If the performance of this Agreement by either party is delayed, curtailed, interrupted or prevented for reasons reasonably beyond such party's direct control, such as strikes, labor difficulties, lockouts, accidents, fires, explosions, inundations, volcanic activity, rebellion, revolution, blockade, embargo, environmental directives, or any other act of any governmental authority, acts of public enemies, acts of God, inability or delays in obtaining transportation, or any other cause, whether or not of the nature enumerated above, which is reasonably beyond the control of such party ("Force Majeure Event"), such party will be excused from the performance of its obligations under this Agreement for so long as the Force

---

[1] The magnesium prices contained in the MSA attached as Exhibit A have been redacted for confidentiality purposes.

Majeure Event continues. The excused party's performance under this agreement will resume as soon as practicable after the Force Majeure Event is remedied or removed.

(MSA ¶ 20(a).)

25.     The MSA requires the party invoking force majeure to give written notice to the other party within 10 days of the occurrence of the Force Majeure Event, stating the extent to which it will be unable to perform its obligations.  (MSA ¶ 20(b).)  The MSA also states that the party invoking force majeure must "exercise due diligence to eliminate or remedy the force majeure event and must notify the other party when the Force Majeure Event is remedied or removed."  (*Id.*)

26.     If a Force Majeure Event results in a decrease of Seller's Product availability, the MSA provides that "Purchaser shall receive a pro rata allocation of the of the available total volume of such Product," based on "the percentage of the Purchaser's contracted volume of such Product during such year in relation to Seller's total volume of such Product at such facility(ies) during such year."  (MSA ¶ 20(d).)

27.     The safety stock obligation is not excused by a Force Majeure Event.  Indeed, the safety stock provision exists specifically to ensure an uninterrupted 60-day supply of Product when it is otherwise unavailable for any reason.  The safety stock is not included in the "available total volume" of the Product at USMag's facilities for purposes of pro rata allocation distributions in the event of a force majeure declaration, as defined by section 20(d) of the MSA – the safety stock is to be delivered *prior* to any other pro rata distributions.

**USMag Declares Force Majeure**

28.     On the evening of September 29, 2021, Tom Kurilich, Director of Sales at USMag, sent the Force Majeure Declaration to Nick Badgett, Kaiser's Director of Raw

Materials.  (Ex. B.)  The Force Majeure Declaration was signed by USMag President and CEO Ron Thayer.

29.     The Force Majeure Declaration stated that the condition was due to "unanticipated failure of critical pieces of manufacturing infrastructure."  USMag further stated that "[t]he equipment failures have disrupted the manufacturing process thereby resulting in limited availably of the magnesium chloride feed that is basic to the production of magnesium metal."

30.     The Force Majeure Declaration provided no additional details as to which pieces of manufacturing infrastructure failed or state the date on which the failure began.  Nor, critically, did USMag provide any timeline as to when the failure was expected to be remedied.

31.     That night, Nate Kane, Raw Materials Manager at Kaiser, spoke with Kurilich, who stated that the Force Majeure Declaration was necessitated by the breakdown of the pump that moves magnesium chloride slurry to the dryers.  (Ex. C.)  Kurilich further stated that the machine that broke was a known bottleneck in the facility, and that it was a piece of  equipment from the 1970s for which parts were not easily replaceable.

32.     Kurilich's statements were consistent with publicly available information about mechanical problems at USMag's plant.

33.     For example, on November 18, 2018, in testimony before the United States International Trade Commission in support of an anti-dumping order pertaining to magnesium from Israel, Cam Tissington, USMag's Vice President of Sales, lamented that magnesium imports were driving down magnesium prices.  Tissington stated that, in the case of at least one piece of critical equipment, low market prices were causing USMag to "defer all but very

essential maintenance" and "we have been forced to reduce our capital investments significantly since 2014." (Ex. D at 22.)

34.     An additional piece of evidence comes from Indeed.com, a well-known job-search website that allows current and former employees to post reviews of their workplaces.  In a comment dated July 28, 2021, a USMag lab technician based in Salt Lake City wrote the following in a review of USMag:  "Lastly, upper management is more concerned about fixing 40 year old equipment with parts from other 40 year old equipment rather than buying new equipment so there is some lengthy downtime at times." (Ex. E.)

35.     Thus, based on the information available to Kaiser, it appears that the mechanical breakdowns that led to the Force Majeure Declaration were, in fact, foreseeable and not reasonably beyond US Mag's control.

**Kaiser is Forced to Cover at Exponentially Higher Prices While USMag Obfuscates**

36.     At the time of USMag's Force Majeure Declaration, Kaiser wasted no time in taking action to cover anticipated losses.  The morning of September 30, 2021, Kaiser began contacting other magnesium suppliers in order to cover the anticipated shortfall in deliveries by USMag under the MSA and has continued to enter into contracts to purchase additional magnesium from other suppliers due to the continuing uncertainty around USMag's ability to restore its capacity.

37.     The same morning, Kaiser acknowledged to USMag receipt of the Force Majeure Declaration and stated that Kaiser would "await additional details required for [Kaiser] to confirm that the declaration of force majeure is appropriate under the circumstances and the language of our existing agreement." (Ex. F.)

38.     On October 1, 2021, Kaiser requested that its 60-day safety stock, which USMag was required keep and offer to Kaiser for sale under ¶ 2(d) of the MSA, be made available before any allocations were made to other purchasers.  (Ex. G.)

39.     The same day, in a response from Tissington, USMag rejected Kaiser's request that USMag honor the MSA's safety stock provisions.  (Ex. H.)  Tissington stated that the MSA's force majeure provisions excused USMag's duty to comply with the safety stock provisions.  Tissington instead offered a pro rata allocation of 345 MT per month (approximately 60% of the monthly commitment in the MSA), but noted that this number was subject to modification "up or down" based on changing circumstances.

40.     USMag's proposed pro rata allocation of 345 MT would leave Kaiser short 234MT each month.

41.     A subsequent communication from USMag, on October 5, 2021, stated that USMag would be able to fulfill the orders Kaiser had already placed for October, but that Kaiser's pro rata allocation of 345 MT would begin in November 2021.  (Ex. I.)  However, USMag did not follow through with the commitment and Kaiser received in October only 66% of the monthly commitment in the MSA.

42.     On October 6, 2021, Kaiser sent another letter to USMag, reiterating Kaiser's demand for delivery of the full safety stock and asking for more information about the circumstances leading to the Force Majeure Declaration.  Kaiser also requested weekly updates on an anticipated repair timeline.  (Ex. J.)

43.     On October 19, 2021, Kaiser sent a follow-up letter asking, again, for information concerning the Force Majeure Declaration, as well as for the calculations supporting USMag's pro rata allocation determinations.  (Ex. K.)

44.    On October 25, 2021, USMag responded with another obfuscatory letter.  USMag again refused to provide details of the purported "catastrophic failures" supposedly behind the Force Majeure Declaration, reiterated its position that declaring force majeure relieved USMag of its obligation to maintain or deliver the 60-day safety stock, and contested whether Kaiser had suffered cognizable damages.  (Ex. L.)

45.    This letter also disputed the description that Kurilich, USMag's Director of Sales, had provided to Kaiser immediately after the Force Majeure Declaration.  The letter dismissed as "speculation" Kaiser's comments about the equipment that moves slurry through the production facility, but provided no specifics of what had actually occurred or any timeline for when full production might be restored.  (*Id.*)

46.    USMag finally provided Kaiser with a timeline as to repairs on October 28, 2021, stating that replacement equipment was expected at the site by November 8, 2021, and that final repairs could be completed as early as November 20, 2021.  (Ex. M.)

47.    However, November 8 and November 20 came and went with no update from USMag.  Kaiser noted this silence in a letter to USMag dated November 22, 2021, and again asked for information regarding the status of magnesium production operations at USMag's facilities.  (Ex. N.)

48.    In a letter dated February 24, 2022, USMag acknowledged that it had received certain parts and supplies in late 2021, but that it was still "experiencing disruptions in the manufacturing process, which is limiting the availability of the magnesium chloride feed necessary for the production of magnesium metal."  (Ex. O.)  The letter also again rejected Kaiser's request to provide access to USMag's facility to investigate the equipment issues.

49.     As of the date of this Complaint, USMag has increased its expected allocation of magnesium to Kaiser, but that allocation has fluctuated wildly and fallen well short of the quantities set by the MSA except for the month of January 2022.  Specifically, USMag provided 66% of the contracted amount in October 2021, 82% in November 2021, 39% in December 2021, 58% in February 2022, and less than 50% in March 2022.

50.     As a result of USMag's failure to meet its contractual obligations, Kaiser will continue to have to purchase any magnesium that it can find on the spot market and enter into new contracts for additional deliveries at prices substantially higher than the MSA prices due to the continuing uncertainty regarding the timing of supply being fully restored

### COUNT I
### (Breach of Contract – Safety Stock)

51.     Kaiser repeats and re-alleges the preceding paragraphs as if fully set forth herein.

52.     The MSA is a valid and enforceable contract between the Parties.

53.     The MSA contains specific provisions regarding USMag's obligation to maintain and offer for sale a 60-day safety stock.

54.     USMag breached the MSA, as well as the implied duty of good faith and fair dealing implied therein, by failing to maintain and offer for sale to Kaiser a 60-day safety stock of magnesium.

55.     The MSA's force majeure provisions do *not* relieve the party declaring a Force Majeure Event from the obligation to maintain a 60-day safety stock.

56.     Kaiser has fully performed its obligations under the MSA.

57.     As a result of USMag's breach of the safety stock provisions of the MSA, Kaiser had to spend to date approximately $10.1 million to purchase thousands of metric tons of

magnesium from other sellers, at significantly higher prices than those provided for in the MSA, in order to have sufficient magnesium to meet Kaiser's supply obligations to its customers.

58.     As a result of USMag's breach of the MSA, as well as the duty of good faith and fair dealing implied therein, Kaiser is entitled to an award of compensatory damages in an amount to be determined at trial.

**COUNT II**
**(Breach of Contract – Improper Force Majeure Declaration)**

59.     Kaiser repeats and re-alleges the preceding paragraphs as if fully set forth herein.

60.     The MSA is a valid and enforceable contract between the Parties.

61.     USMag breached the MSA, as well as the implied duty of good faith and fair dealing implied therein, by failing to supply magnesium at the rates provided for by the MSA.

62.     USMag's Force Majeure Declaration was invalid.  Based on the information currently available to Kaiser, the mechanical breakdowns could have been avoided if the equipment had been properly maintained.  Accordingly, whatever breakdowns occurred were not reasonably beyond USMag's control.

63.     In addition, the MSA contains specific provisions regarding a party's rights and obligations in the event of a force majeure declaration.  The MSA's force majeure provisions require the party declaring force majeure to exercise diligence to remedy the force majeure event and provide prompt notice to the other party.

64.     USMag has failed to provide adequate information regarding the events that led to the Force Majeure Declaration.  USMag has also failed to keep Kaiser adequately informed of USMag's efforts to rectify the situation and perform under the contract, making it even harder for Kaiser to forecast its need to cover to fulfill its contractual commitments.

65.     Kaiser has fully performed its obligations under the MSA.

66.     USMag's deliveries have been and remain well below the amounts agreed in the MSA.

67.     As a result of USMag's breaches of the MSA, Kaiser has spent to date approximately $10.1 million to purchase thousands of MTs of magnesium from other sellers, at significantly higher prices than those provided for in the MSA, in order to have sufficient magnesium to meet Kaiser's supply obligations to its customers.

68.     Kaiser will also incur additional costs to purchase thousands of MTs of magnesium from other sellers, at significantly higher prices than those provided for in the MSA, in order to continue Kaiser's operations uninterrupted.

69.     Accordingly, Kaiser is entitled to an award of compensatory damages in an amount to be determined at trial, but no less than approximately $10.1 million.

## PRAYER FOR RELIEF

70.     Kaiser repeats and realleges each and every allegation above as if fully set forth herein.

71.     Wherefore, Kaiser prays for relief and judgment as follows:

a.      On Count I and II, compensatory damages to cover the loss incurred by Kaiser's need to purchase thousands of MTs of magnesium from other suppliers on very short notice through the end of March 2022, in an amount to be determined at trial, but no less than approximately $10.1 million;

b.      On Count II, additional compensatory damages in an amount to be determined at trial for amounts paid after the end of March 2022 to cover the loss incurred by Kaiser's purchases of magnesium from other suppliers at higher prices than contracted for in the MSA;

    c.   Awarding pre- and post-judgment interest;

    d.   Awarding Plaintiff attorney's fees and costs; and

    e.   Granting such and other further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Kaiser demands a trial by jury in this action of all issues so triable.

Dated: New York, New York
       April 14, 2022

MCDERMOTT WILL & EMERY LLP

s/ *Andrew B. Kratenstein*
Andrew B. Kratenstein
Matthew J. Barnett
One Vanderbilt Avenue
New York, New York 10017
(212) 547-5400

*Attorneys for Plaintiff*
*Kaiser Aluminum Warrick, LLC*