# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

KAISER ALUMINUM WARRICK, LLC,

               Plaintiff,

   -against-

US MAGNESIUM, LLC,

               Defendant.

Case No. 1:22-cv-3105-JGK

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Kaiser Aluminum Warrick, LLC ("Kaiser" or "Purchaser"), by and through its undersigned attorneys, McDermott Will & Emery LLP, brings this complaint against Defendant US Magnesium, LLC ("US Mag" or "Seller"), and alleges as follows:

## INTRODUCTION

1.     This dispute arises out of US Mag's breach of its contractual obligations to Kaiser.  Pursuant to the parties' Magnesium Supply Agreement (the "MSA") (Ex. A), effective as of October 9, 2020, US Mag was to sell certain quantities of pure magnesium to Kaiser at specified prices, beginning in December 2020 and continuing through December 2022.

2.     Kaiser owns and operates an aluminum rolling mill in Newburgh, Indiana.  Kaiser is an indirect wholly-owned subsidiary of Kaiser Aluminum Corporation, a leading producer of semi-fabricated specialty aluminum products.  Kaiser Aluminum Corporation and its subsidiaries serve customers worldwide with highly-engineered solutions for aerospace and high-strength, packaging, general engineering, custom automotive, and other industrial uses.  Kaiser's products include bare and coated aluminum coil for can stock applications in the beverage and food packaging industry in North America.  Magnesium is an essential component in many of Kaiser's products.

3.      The parties bought and sold magnesium in accordance with the MSA for approximately nine months.  On September 29, 2021, US Mag sent Kaiser a declaration of force majeure (the "Force Majeure Declaration").  (Ex. B.)

4.      The Force Majeure Declaration was vague, blaming the supply disruption on the unanticipated failure of "critical pieces of manufacturing infrastructure."  The Force Majeure Declaration provided no information as to what steps US Mag was taking to rectify the failed "manufacturing infrastructure" and no information as to when the failure might be rectified.

5.      In addition, the MSA obligated US Mag to maintain a 60-day supply of magnesium (the "safety stock") calculated based on past purchase amounts, for sale to Kaiser in the event of a supply disruption – just like the one that has caused Kaiser millions in dollars of damages and that has necessitated this lawsuit.  However, in communications with Kaiser after the Force Majeure Declaration, US Mag took the position that the Force Majeure Declaration excused US Mag of its safety stock obligation.

6.      US Mag's Force Majeure Declaration and refusal to supply safety stock threatened to disrupt Kaiser's own production schedule, jeopardizing Kaiser's relationships with its customers and creating a risk that Kaiser would have to declare force majeure to its customers (which eventually occurred in July 2022).

7.      Accordingly, Kaiser immediately took steps to purchase magnesium from other suppliers, which was at spot market prices significantly higher (on the order of approximately 3x to 6x) than the fixed prices that Kaiser would otherwise pay US Mag under the MSA.

8.      Over the course of the months following the Force Majeure Declaration, and despite Kaiser's repeated requests, US Mag repeatedly refused to provide basic information as to

the nature of the purported mechanical breakdowns that led to the Force Majeure Declaration, the status of the repairs and continuing challenges impacting the repairs, the magnesium US Mag expected to be able to supply, or the timing of anticipated deliveries to Kaiser.

9.      It appears that US Mag is engaged in a calculated plan to obscure and hide the true cause of its manufacturing problems and failure to meet its obligations and to avoid acknowledging its failures to anticipate, plan for, avoid, mitigate, and remedy its problems. Despite repeated requests from Kaiser and repeated opportunities for US Mag to come clean, US Mag persisted in evading any forthright disclosure, transparency, or accountability.  This misconduct has further harmed Kaiser, including in preventing and impeding Kaiser's own ability to mitigate its damages and the harms caused by US Mag's failures.

10.      Based on information obtained by Kaiser from sources other than US Mag, it appears that the equipment at issue was poorly maintained, its breakdown foreseeable, and not reasonably beyond US Mag's control.  Thus, the Force Majeure Declaration was improper.

11.      As a result of US Mag's drastic reduction in magnesium supply, Kaiser eventually no longer was able to obtain sufficient cover magnesium to meet Kaiser's aluminum supply obligations to its customers, causing Kaiser to declare force majeure on July 7, 2022.  Thus, as a natural and foreseeable consequence of US Mag's contractual breaches, and in addition to the tens of millions of dollars spent on cover magnesium, Kaiser has lost additional tens of millions of dollars in sales and profits and has suffered other related and unquantifiable losses.

12.      As of the date of this Amended Complaint, US Mag has not completed its repairs and Kaiser is still not receiving quantities set by the MSA.  Indeed, US Mag advised Kaiser by letters dated August 24, 2022 and September 20, 2022, that US Mag was completely shutting down its magnesium production and that it would not supply any magnesium to Kaiser for the

rest of the MSA's term, which runs through the end of 2022.  And yet US Mag still has not explained the circumstances that caused it to declare force majeure, much less what it did to anticipate and avoid them or why they were unforeseen by US Mag – or even if they were indeed unforeseen.  US Mag offers only empty, vague excuses amid dwindling and now no performance.

13.     These breaches have caused Kaiser and its customers significant harm.  Kaiser currently estimates that it has and will suffer damages exceeding $85 million as a result of US Mag's breaches of the MSA.  These damages continue to accrue.

**PARTIES**

14.     Plaintiff Kaiser is a Delaware limited liability company whose sole member is Kaiser Aluminum Fabricated Products, LLC.  The sole member of Kaiser Aluminum Fabricated Products, LLC is Kaiser Aluminum Investments Company, which is a Delaware corporation with its principal place of business in Tennessee.  The parent company and sole shareholder of Kaiser Aluminum Investments Company is Kaiser Aluminum Corporation, which is a publicly traded company.  Kaiser Aluminum Corporation is incorporated in Delaware and its principal place of business is in Tennessee.  As noted, Kaiser produces bare and coated aluminum coil for can stock applications in the beverage and food packaging industry in North America.

15.     Defendant US Mag is a Delaware limited liability company.  Its sole member is The Renco Group, Inc. ("Renco"), which is a private investment holding company that is incorporated and has its principal place of business in New York.  US Mag harvests and processes salts from the Great Salt Lake to produce magnesium and other chemical products and is an instrumentality of Renco.

16.     As US Mag's sole member, Renco controls operations, decision-making, financing, and the capital expenditures of US Mag, and US Mag ultimately is directed by Renco employees, officers, and/or directors.  Renco exercises and exerts control over US Mag.

### JURISDICTION AND VENUE

17.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) as the controversy is between (a) a citizen of Delaware and Tennessee and (b) a citizen of New York, and because Kaiser seeks damages in an amount in excess of $75,000, exclusive of interest and costs.

18.     Personal jurisdiction over Defendant and venue are proper by agreement of the parties.  Specifically, Section 21 of the MSA states that "Any and all disputes between the parties that may arise pursuant to this Contract will be heard and determined before an appropriate arbitrator or state court located in New York, New York or any federal court in the Southern District of New York."

19.     Section 21 of the MSA further states that "Seller acknowledges and agrees that any such court will have the jurisdiction to interpret and enforce the provisions hereof and/or an arbitrators judgment, and the Seller waives any and all objections that it might otherwise have as to personal jurisdiction or venue in any of the above tribunals."

20.     In addition, US Mag is a limited liability company and its sole member, Renco, is a citizen of New York.

## FACTUAL ALLEGATIONS

**The Magnesium Supply Agreement**

21.     The MSA was entered into by US Mag (as "Seller") and Alcoa Warrick LLC (as "Purchaser") effective October 9, 2020.

22.     Kaiser Aluminum Corporation purchased the equity in Alcoa Warrick LLC from Alcoa USA Corp., an indirect wholly-owned subsidiary of Alcoa Corporation, pursuant to a Purchase Agreement dated November 30, 2020.  The transaction closed on March 31, 2021.  Alcoa Warrick LLC was then renamed Kaiser Aluminum Warrick, LLC.  It is undisputed that Kaiser is the real party in interest and the beneficiary of US Mag's obligations under the MSA.

23.     In addition to US Mag knowing full well the basis for Kaiser's need for and the intended use of the magnesium, the MSA specifically contemplates that Kaiser would purchase magnesium from US Mag for the production and sale of aluminum to Kaiser's customers.  Specifically, the sole WHEREAS clause of the MSA states its fundamental basis for Kaiser:

> WHEREAS, Purchaser requires magnesium for the production of end products and Seller desires to supply Purchaser with its magnesium requirements[.]

24.     The MSA further provides that, for the period of December 1, 2020 to December 31, 2022, US Mag would sell certain quantities of pure magnesium ingot (the "Product") to Kaiser at specified prices.

25.     Specifically, the MSA provides for a minimum purchase of 6674 metric tons ("MT") and a maximum purchase of 7526 MT of Product for the period from December 1, 2020 to December 31, 2021, and also for the period from January 1, 2022 to December 31, 2022.  (MSA ¶ 2(a)-(b).)  The MSA further provides that US Mag is to schedule its monthly production based on a Monthly Forecast provided by Kaiser ten days prior to the start of each month.  (MSA ¶ 2(c).)

26.     The MSA also specifies prices of Product from December 1, 2020 to December 31, 2021, and from January 1, 2022 to December 31, 2022.  (MSA ¶ 3(a)-(b).)[1]

27.     The MSA requires Seller to maintain a 60-day supply of safety stock:  "At all times during the term of this Agreement, Seller shall carry a safety stock of sixty (60) days of Purchaser's average consumption."  (MSA ¶ 2(d).)  The purpose of the safety stock provision is to ensure a steady and reliable supply of Product for at last 60 days in the event that supply is interrupted for any reason.  The safety stock should be on hand at US Mag for use and immediate deployment in the event there is an event of force majeure or other interruption.  The safety stock obligation is separate and in addition to US Mag's obligation to supply magnesium generally to Kaiser under the MSA.

28.     The MSA also contains a force majeure clause, which states:

If the performance of this Agreement by either party is delayed, curtailed, interrupted or prevented for reasons reasonably beyond such party's direct control, such as strikes, labor difficulties, lockouts, accidents, fires, explosions, inundations, volcanic activity, rebellion, revolution, blockade, embargo, environmental directives, or any other act of any governmental authority, acts of public enemies, acts of God, inability or delays in obtaining transportation, or any other cause, whether or not of the nature enumerated above, which is reasonably beyond the control of such party ("Force Majeure Event"), such party will be excused from the performance of its obligations under this Agreement for so long as the Force Majeure Event continues. The excused party's performance under this agreement will resume as soon as practicable after the Force Majeure Event is remedied or removed.

(MSA ¶ 20(a).)

29.     The MSA requires the party invoking force majeure to give written notice to the other party within 10 days of the occurrence of the Force Majeure Event, stating the extent to which it will be unable to perform its obligations.  (MSA ¶ 20(b).)  The MSA also states that the

---

[1] The magnesium prices contained in the MSA attached as Exhibit A have been redacted for confidentiality purposes.

party invoking force majeure must "exercise due diligence to eliminate or remedy the force majeure event and must notify the other party when the Force Majeure Event is remedied or removed." (*Id.*)

30.     If a Force Majeure Event results in a decrease of Seller's Product availability, the MSA provides that "Purchaser shall receive a pro rata allocation of the of the available total volume of such Product," based on "the percentage of the Purchaser's contracted volume of such Product during such year in relation to Seller's total volume of such Product at such facility(ies) during such year."  (MSA ¶ 20(d).)

31.     The safety stock obligation is not excused by a Force Majeure Event.  Indeed, the safety stock provision exists specifically to ensure an uninterrupted 60-day supply of Product when it is otherwise unavailable for any reason.  The safety stock is not included in the "available total volume" of the Product at US Mag's facilities for purposes of pro rata allocation distributions in the event of a force majeure declaration, as defined by section 20(d) of the MSA – the safety stock is to be delivered *prior* to any other pro rata distributions

32.     Even if US Mag's safety stock obligation could be excused by a Force Majeure Event – it cannot – US Mag's safety stock obligations are not excused here because, as discussed below, US Mag's Force Majeure Declaration was improper.  Nor has either the Force Majeure Declaration or any other information that US Mag provided explained or established why US Mag's failure to maintain or otherwise supply the safety stock to Kaiser was *itself* caused by a Force Majeure Event, *i.e.*, why US Mag supposedly was "delayed, curtailed, interrupted or prevented for reasons reasonably beyond [US Mag's] direct control" in meeting its obligations to maintain the safety stock and provide one hundred percent of it to Kaiser.  Irrespective of whether the Force Majeure Declaration was proper and supported – it was not – it does not

excuse US Mag's previous failure to maintain, have on hand, and provide the full safety stock to Kaiser.

**US Mag Declares Force Majeure**

33.     On the evening of September 29, 2021, Tom Kurilich, Director of Sales at US Mag, sent the Force Majeure Declaration to Kaiser by email to Nick Badgett, Director of Raw Materials.  (Ex. B.)  The Force Majeure Declaration was signed by US Mag President and Chief Executive Officer Ron Thayer.

34.     The Force Majeure Declaration stated that the condition was due to "unanticipated failure of critical pieces of manufacturing infrastructure."  US Mag further stated that "[t]he equipment failures have disrupted the manufacturing process thereby resulting in limited availably of the magnesium chloride feed that is basic to the production of magnesium metal."

35.     The Force Majeure Declaration provided no additional details as to which pieces of manufacturing infrastructure failed or state the date on which the failure began.  Nor, critically, did US Mag provide any timeline as to when the failure was expected to be remedied.

36.     That night, Nate Kane, Raw Materials Manager at a Kaiser affiliate, spoke with Kurilich, who stated that the Force Majeure Declaration was necessitated by the breakdown of the pump that moves magnesium chloride slurry to the dryers.  (Ex. C.)  Kurilich further stated that the machine that broke was a known bottleneck in the facility, and that it was a piece of equipment from the 1970s for which parts were not easily replaceable.

37.     As discussed below, US Mag would later disclaim Kurilich's statements. However, they were consistent with publicly available information about mechanical problems at US Mag's plant.

38.     For example, on November 14, 2018, in testimony before the United States International Trade Commission ("ITC") in support of an anti-dumping order pertaining to magnesium imported from Israel, Cam Tissington, US Mag's Vice President of Sales, lamented that magnesium imports were driving down magnesium prices.  Tissington stated that, in the case of at least one piece of critical equipment, low market prices were causing US Mag to "defer all but very essential maintenance" and "we have been forced to reduce our capital investments significantly since 2014."  (Ex. D at 22.)[2]

39.     An additional piece of evidence comes from Indeed.com, a well-known job-search website that allows current and former employees to post reviews of their workplaces.  In a comment dated July 28, 2021, a US Mag lab technician based in Salt Lake City wrote the following in a review of US Mag:  "Lastly, upper management is more concerned about fixing 40 year old equipment with parts from other 40 year old equipment rather than buying new equipment so there is some lengthy downtime at times."  (Ex. E.)  Although US Mag subsequently attempted to cast dispersions on the author of this candid disclosure,[3] US Mag has not challenged the truth of the disclosure or offered any evidence or explanation to contradict it.

40.     It appears that the mechanical breakdowns that led to the Force Majeure Declaration were, in fact, foreseeable and not reasonably beyond US Mag's control.  And

---

[2] The transcript of this hearing is publicly available on the website of the United States International Trade Commission.  *See* U.S. INT'L TRADE COMM'N, *In the Matter of Magnesium from Israel: Conference Transcript*, (Nov. 14, 2018) https://www.usitc.gov/trade_remedy/731_ad_701_cvd/investigations/2018/ Magnesium%20From%20Israel/Preliminary/revised-magnesium_from_israel-conferecne-11-14-2018.pdf.  US Mag has separately asserted that "Kaiser appears to be trying to use this lawsuit as leverage" in a separate and ongoing ITC proceeding relating to commercial magnesium imports.  (ECF No. 31 at 1.)  That is false.  To the contrary, Kaiser is "using this lawsuit" as the available legal means to obtain relief for US Mag's failure to meet its contractual obligations to Kaiser and the damages US Mag has caused Kaiser.  Kaiser is advocating in the pending ITC proceeding that tariffs on magnesium be lifted because the combination of US Mag's Force Majeure Declaration and tariffs on Chinese magnesium imports have made it exorbitantly expensive for Kaiser (a domestic aluminum producer) to obtain magnesium to replace the magnesium that US Mag has not been supplying to Kaiser since the improper Force Majeure Declaration and now appears wholly unable to supply for the foreseeable future.

[3] ECF No. 31 at 1.

US Mag has not met its obligation to explain and establish that any such mechanical breakdowns were caused by reasons reasonably beyond US Mag's direct control and without US Mag's fault or negligence, nor has US Mag done so with respect to its failure to maintain and provide the safety stock.

**Kaiser is Forced to Cover at Exponentially Higher Prices While US Mag Obfuscates**

41.     At the time of US Mag's Force Majeure Declaration, Kaiser wasted no time in taking action to cover anticipated losses.  The morning of September 30, 2021, Kaiser began contacting other magnesium suppliers in order to cover the anticipated shortfall in deliveries by US Mag under the MSA and has continued to enter into contracts to purchase additional magnesium from other suppliers due to the continuing uncertainty around US Mag's ability to restore its capacity.

42.     The same morning, Kaiser acknowledged to US Mag receipt of the Force Majeure Declaration and stated that Kaiser would "await additional details required for [Kaiser] to confirm that the declaration of force majeure is appropriate under the circumstances and the language of our existing agreement."  (Ex. F.)

43.     On October 1, 2021, Kaiser requested that its 60-day safety stock, which US Mag was required keep and offer to Kaiser for sale under ¶ 2(d) of the MSA, be made available before any allocations were made to other purchasers.  (Ex. G.)

44.     The same day, in a response from Tissington, US Mag rejected Kaiser's request that US Mag honor the MSA's safety stock provisions.  (Ex. H.)  Tissington stated that the MSA's force majeure provisions excused US Mag's duty to comply with the safety stock provisions.  Rather than supplying Kaiser with one hundred percent of the safety stock as required by the MSA, Tissington instead offered a pro rata allocation of 345 MT of Product per

month (approximately 60% of the monthly commitment in the MSA), but noted that this number

was subject to modification "up or down" based on changing circumstances.

46.     US Mag's proposed pro rata allocation of 345 MT of Product would leave Kaiser

short 234 MT of Product each month.

46.     A subsequent communication from US Mag, on October 5, 2021, stated that

US Mag would be able to fulfill the orders Kaiser had already placed for October, but that

Kaiser's pro rata allocation of 345 MT of Product would begin in November 2021.  (Ex. I.)

However, US Mag did not follow through with the commitment and Kaiser received in October

only approximately 69% of Kaiser's order.

47.     On October 6, 2021, Kaiser sent another letter to US Mag, reiterating Kaiser's

demand for delivery of the full safety stock and asking for more information about the

circumstances leading to the Force Majeure Declaration.  Kaiser also requested weekly updates

on an anticipated repair timeline.  (Ex. J.)

48.     On October 19, 2021, Kaiser sent a follow-up letter asking, again, for information

concerning the Force Majeure Declaration, as well as for the calculations supporting US Mag's

pro rata allocation determinations.  (Ex. K.)

49.     On October 25, 2021, US Mag responded with another obfuscatory letter.

US Mag again refused to provide details of the purported "catastrophic failures" supposedly

behind the Force Majeure Declaration, reiterated its position that declaring force majeure

relieved US Mag of its obligation to maintain or deliver the 60-day safety stock (again without

explaining how any purported event of force majeure prevented US Mag from complying with

the safety stock provisions), and – even more remarkably – contested whether Kaiser had

suffered cognizable damages.  (Ex. L.)

50.     This letter also disputed the description that Kurilich, US Mag's Director of Sales, had provided immediately after the Force Majeure Declaration.  The letter dismissed as "speculation" Kaiser's comments about the equipment that moves slurry through the production facility, but provided no specifics of what had actually occurred or any timeline for when full production might be restored.  (*Id.*)

51.     US Mag finally provided Kaiser with a timeline as to repairs on October 28, 2021, stating that replacement equipment was expected at the site by November 8, 2021, and that final repairs could be completed as early as November 20, 2021.  (Ex. M.)

52.     However, this assertion too was proved wrong.  November 8 and November 20 came and went with no update from US Mag.  Kaiser noted this silence in a letter to US Mag dated November 22, 2021, and again asked for information regarding the status of magnesium production operations at US Mag's facilities.  (Ex. N.)

53.     In a letter dated February 24, 2022, US Mag acknowledged that it had received certain parts and supplies in late 2021, but that it was still "experiencing disruptions in the manufacturing process, which is limiting the availability of the magnesium chloride feed necessary for the production of magnesium metal."  (Ex. O.)  The letter also again rejected Kaiser's request to provide access to US Mag's facility to investigate the equipment issues.

54.     Without specifics or support, US Mag has since claimed in this proceeding that the COVID-19 pandemic is to blame, hampering US Mag's ability to repair its plant. (ECF No. 36 at 1-3.)  This assertion appears to be another empty excuse from US Mag, now shamelessly using the pandemic to cloak further its undescribed manufacturing problems. US Mag has not claimed that – much less explained how – the COVID-19 pandemic caused the still undisclosed equipment or machinery failure that US Mag claims gave rise to the

Force Majeure Declaration in the first place.  Nor has US Mag articulated how the COVID-19 pandemic prevented US Mag from anticipating and avoiding the mysterious equipment or machinery failure or why that failure was unforeseeable and without US Mag's fault or negligence.

55.     US Mag's failures to communicate candidly and directly with Kaiser, as well as US Mag's inconsistent and fluctuating deliveries (when it did deliver), both increased Kaiser's damages and made it more difficult to, and in some cases prevented Kaiser from, mitigating its damages.

56.     After US Mag declared force majeure, US Mag's allocation of Product to Kaiser fluctuated wildly and fell well short of the quantities set by the MSA.

57.     As a result of US Mag's failure to meet its contractual obligations, Kaiser attempted to purchase any magnesium that it could find on the spot market and entered into new contracts for additional magnesium deliveries at prices substantially higher than the MSA prices due to the continuing uncertainty regarding the timing of supply being fully restored.  Kaiser also purchased scrap aluminum with higher magnesium content.

58.     In addition to expending significant management time to identify and secure new magnesium supply, Kaiser has had to qualify those suppliers through a required, stringent process of external and internal testing, which extends for several weeks at the cost of great but unquantifiable operational disruption.  Moreover, US Mag's breaches, failure to deliver magnesium, and inconsistent and absent communication also required Kaiser substantial business and operational disruption and also damaged Kaiser's relationships with its customers and its overall reputation as a reliable supplier, which has damaged Kaiser in both quantifiable and unquantifiable ways.

**As a Result of US Mag's Breaches, Kaiser is Forced to Declare Force Majeure**

59.     Kaiser made every effort to obtain cover magnesium in different forms (both pure magnesium and scrap aluminum with high magnesium content) in order to meet Kaiser's aluminum supply obligations.  However, without warning to Kaiser, US Mag's magnesium deliveries to Kaiser suddenly and precipitously dropped beginning in June 2022.

60.     Specifically, from October 2021 through May 2022, despite not meeting its full obligations to Kaiser, US Mag still supplied at least half of the monthly quantity of Product Kaiser had declared under the MSA.  However, in June 2022, without warning, US Mag supplied only 27% of the volume declared by Kaiser, then just 36% in July 2022, and only 15% in August 2022.  This abrupt and unannounced drop in magnesium shipments from US Mag only exacerbated and further increased Kaiser's damages while further hindering and preventing Kaiser from mitigating its damages.

61.     The magnesium supplied by US Mag starting in June 2022 was also off-specification.  Kaiser accepted that product anyway (without waiving Kaiser's right to reject future off-specification deliveries) in a further attempt to mitigate Kaiser's damages.

62.     However, given the sudden and unanticipated drop in US Mag's production in June 2022, and despite its best efforts to secure alternate magnesium supply in any form, Kaiser was unable to acquire enough cover magnesium on the open market or through high magnesium aluminum scrap purchases to meet all of Kaiser's magnesium needs.

63.     As a direct result, on July 7, 2022, Kaiser was forced to declare force majeure on its own supply agreements, in turn losing tens of millions of dollars' worth of the very sales and related profits that were the entire basis for Kaiser entering into the MSA.  Those damages were and are the natural and foreseeable consequence of US Mag's breaches of the MSA.

64.     Kaiser's declaration of force majeure and subsequent communication of lower aluminum shipment volume allocations to Kaiser's customers forced those customers to secure the missing pounds of aluminum elsewhere.

65.     The uncommunicated, precipitous decline in US Mag's production in June 2022 also forced Kaiser to idle half of its aluminum casting facility for approximately ten days in July due to low magnesium levels, also causing and contributing to Kaiser's damages.

66.     Things only got worse from there.  By letter dated August 24, 2022, US Mag informed Kaiser that it was halting *all* magnesium production likely for the remainder of 2022. (Ex. P.)  The letter stated:

> US Magnesium remains under a situation of "force majeure" for magnesium products.  Despite all efforts, the ongoing attempts to attain higher magnesium production rates in recent months have been unsuccessful.  US Magnesium will be temporarily idling magnesium production to work on electrolysis cells in order to facilitate future production.  This is expected to take roughly three months.  During this period there will be no magnesium products available for shipment.

67.     Furthering US Mag's scheme to obscure the true cause of its failures and evade accountability, US Mag's letter again offered no details on what equipment or machinery failures caused the Force Majeure Declaration and what "efforts" were made to plan for, avoid, mitigate, or otherwise promptly remedy those failures.

68.     Through great effort, Kaiser was ultimately able to secure and qualify magnesium from alternative sources to meet its requirements for the remainder of 2022, enabling Kaiser to lift its own force majeure declaration on September 6, 2022.  However, the impact on Kaiser of US Mag's Force Majeure Declaration continues to be felt by Kaiser in ways both quantifiable and unquantifiable.

69.     By letter dated September 20, 2022, US Mag informed Kaiser that "all electrolytic cells have been taken offline and the process of component recovery and salvage is underway."

US Mag further advised that restart of production "is not possible by December 2022" and "demolition, rebuild, and restart" was expected to take "on the order of six months." (Ex. Q.) Again, US Mag did not explain what equipment or machinery failures caused the Force Majeure Declaration in the first place and why those failures could not have been avoided, mitigated, or more promptly remedied.

70.     To date, Kaiser estimates that the total damages it has and will suffer as a result of US Mag's breaches of the MSA exceed $85 million. These damages continue to accrue.

## COUNT I
### (Breach of Contract – Failure to Supply Based on Improper Force Majeure Declaration)

71.     Kaiser repeats and re-alleges the preceding paragraphs as if fully set forth herein.

72.     The MSA is a valid and enforceable contract between the parties.

73.     Kaiser has fully performed its obligations under the MSA.

74.     US Mag breached the MSA, as well as the implied duty of good faith and fair dealing implied therein, by failing to supply magnesium (including safety stock) in the quantities and at the rates provided for by the MSA.

75.     US Mag's Force Majeure Declaration was invalid. Based on the information currently available to Kaiser, the purported mechanical breakdowns could have been avoided if the equipment had been properly maintained. Accordingly, whatever breakdowns occurred were not reasonably beyond US Mag's control and without US Mag's fault or negligence.

76.     In addition, the MSA contains specific provisions regarding a party's rights and obligations in the event of a force majeure declaration. The MSA's force majeure provisions require the party declaring force majeure to exercise diligence to remedy the force majeure event and provide prompt notice to the other party.

77.     US Mag has failed to provide adequate information regarding the events that led to the Force Majeure Declaration.  US Mag has also failed to keep Kaiser adequately informed of US Mag's efforts to rectify the situation and perform under the contract, making it even harder for Kaiser to forecast its need to cover to fulfill its contractual commitments.

78.     US Mag's Product deliveries have been and remain well below the amounts agreed in the MSA.  Indeed, by letters dated August 24, 2022 and September 20, 2022, US Mag announced that it was ceasing production in toto and would make no further Product deliveries through the end of the MSA's term.

79.     As a result of US Mag's breaches of the MSA, Kaiser has spent tens of millions of dollars to purchase thousands of tons of magnesium from other sellers, at significantly higher prices than those provided for in the MSA, in order to have sufficient magnesium to meet as best Kaiser can Kaiser's supply obligations to its customers.

80.     However, as a result of US Mag's ongoing breaches and failure to supply magnesium to Kaiser – which failure materially, suddenly, and unexpectedly to Kaiser worsened beginning in June 2022 – Kaiser had to declare force majeure to its customers on July 7, 2022, losing tens of millions of dollars more in sales and profits directly as consequence of US Mag's breaches.

81.     Kaiser has also incurred more difficult to quantify disruptions to its business including in managing its operations with inconsistent and absent magnesium deliveries from US Mag and having to qualify new magnesium suppliers and engage in third-party testing. Kaiser thus incurred the opportunity cost of having Kaiser personnel forced to address the fall out of US Mag's Force Majeure Declaration rather than on other activities aimed at maintaining and improving Kaiser's operations.  US Mag's lack of transparency and communication,

obfuscation, and inconsistent and incorrect communications all exacerbated Kaiser's damage and impeded its efforts to mitigate its damages.

82.     To date, Kaiser estimates that the quantifiable damages that Kaiser has suffered as a result of US Mag's breaches describes above exceed $85 million.  These damages continue to accrue.

83.     Accordingly, Kaiser is entitled to an award of compensatory damages in an amount to be determined at trial, but no less than $85 million.

**COUNT II**
**(Breach of Contract – Safety Stock)**

84.     Kaiser repeats and re-alleges the preceding paragraphs as if fully set forth herein.

85.     The MSA is a valid and enforceable contract between the Parties.

86.     Kaiser has fully performed its obligations under the MSA.

87.     The MSA contains specific provisions regarding US Mag's obligation to maintain and offer for sale to Kaiser a 60-day safety stock, which obligations are separate and in addition to US Mag's obligation to supply magnesium generally to Kaiser under the MSA.

88.     US Mag breached the MSA, as well as the implied duty of good faith and fair dealing implied therein, by failing to maintain and offer for sale to Kaiser a 60-day safety stock of magnesium.

89.     The MSA's force majeure provision does not relieve US Mag from its obligation to maintain a 60-day safety stock for Kaiser and deliver that safety stock in the event of a supply disruption.

90.     However, even if a properly declared force majeure could excuse US Mag's safety stock obligation – which it cannot – US Mag's Force Majeure Declaration was improper for the reasons stated above and thus US Mag violated its safety stock obligation.  Moreover,

even if the Force Majeure Declaration was valid – it was not – US Mag has not established that its failure to maintain the safety stock and provide one hundred percent of it to Kaiser was itself caused by a Force Majeure Event, which also is a breach of the MSA.

91.     If US Mag is found in breach of its obligation to maintain and supply Kaiser with 60 days' worth of safety stock, Kaiser estimates that its damages from having to obtain cover magnesium to replace the safety stock that US Mag should have supplied are at least $13 million.

92.     Accordingly, as a result of US Mag's breaches of the MSA, as well as the duty of good faith and fair dealing implied therein, in the event that US Mag is deemed to be in breach only of the MSA's safety stock provision, Kaiser is entitled to an award of compensatory damages in an amount to be determined at trial but no less than $13 million.

**PRAYER FOR RELIEF**

93.     Kaiser repeats and realleges each and every allegation above as if fully set forth herein.

94.     Wherefore, Kaiser prays for relief and judgment as follows:

a.      On Count I, compensatory damages to cover the out-of-pocket costs and lost profits incurred by Kaiser as a result of US Mag's failure to supply Kaiser with the quantities of magnesium required under the MSA at the prices contained in the MSA in an amount to be determined at trial, but no less than $85 million;

b.      On Count II, in the event that US Mag is deemed to be in breach only of the safety stock provision of the MSA, Kaiser is entitled to an award of compensatory damages in an amount to be determined at trial but no less than $13 million;

c.      Awarding pre- and post-judgment interest;

d.      Awarding Plaintiff attorney's fees and costs; and

e.   Granting such and other further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Kaiser demands a

trial by jury in this action of all issues so triable.

Dated: New York, New York          McDermott Will & Emery LLP
       September 27, 2022

                                  s/  *Andrew B. Kratenstein*
                                  Andrew B. Kratenstein
                                  Monica S. Asher
                                  Amella Viso
                                  One Vanderbilt Avenue
                                  New York, New York 10017
                                  (212) 547-5400

                                  *Attorneys for Plaintiff*
                                  *Kaiser Aluminum Warrick, LLC*