```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK

In re:                               :
                                           Docket #1:22-cv-03105-
 KAISER ALUMINUM WARRICK, LLC,       :  JGK-KHP

                    Plaintiff,       :

  - against -                        :

 US MAGNESIUM LLC,                   :  New York, New York
                                        February 14, 2023
                    Defendant.       :
                                        TELEPHONE CONFERENCE
------------------------------------ :


                     PROCEEDINGS BEFORE
             THE HONORABLE KATHARINE H. PARKER,
               UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:          MCDERMOTT WILL & EMERY LLP
                        BY:  ANDREW B. KRATENSTEIN, ESQ.
                             MONICA SUSAN ASHER, ESQ.
                             TIMOTHY C. CRAMTON, ESQ.
                             CINDY SEELAH (PHONE), ESQ.
                        One Vanderbilt Avenue
                        New York, New York 10017-5404


For Defendant           BURBIDGE MITCHELL
US Magnesium LLC:       BY:  CAROLYN J. LEDUC, ESQ.
                        215 S. State Street, Suite 920
                        Salt Lake City, Utah 84111

                        BLANK ROME LLP
                        BY:  MARTIN SIMON KREZALEK, ESQ.
                        1271 Avenue of Americas
                        New York, New York 10020

Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com


Proceedings conducted telephonically and recorded by
electronic sound recording;
Transcript produced by transcription service
```

APPEARANCES - CONTINUED:

```
For Third Party          CADWALADER, WICKERSHAM & TAFT LLP
The Renco Group, Inc.:   BY:  JOSHUA REID WEISS, ESQ.
                         One World Financial Center
                         New York, New York 10281
```

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| None | | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

```
 1                          PROCEEDINGS                    4

 2              THE CLERK:  -- 22-civil-3105, Kaiser Aluminum

 3    Warrick vs. US Magnesium; the Honorable Katharine H.

 4    Parker, presiding.

 5              Beginning with counsel for the plaintiff,

 6    please make your appearance for the record.

 7              MR. ANDREW B. KRATENSTEIN:  Good morning, your

 8    Honor.  This is Andrew Kratenstein from McDermott Will &

 9    Emery.  With me on the line, also from my firm, are

10    Monica Asher, Tim Cramton and Cindy Seelah (ph).

11              HONORABLE KATHARINE H. PARKER (THE COURT):

12    All right, good afternoon, counsel; this is Judge Cott.

13              THE CLERK:  And counsel for the defendant,

14    please make your appearance for the record.

15              MS. CAROLYN J. LEDUC:  This is Carolyn LeDuc

16    appearing on behalf of US Magnesium.  With me from my

17    office is Kathy Kristofferson (ph).

18              THE COURT:  Hello.

19              MR. MARTIN KREZALEK:  And this is --

20              THE CLERK:  I'm sorry, we have a third party

21    that's dialed in, as well.

22              MR. KREZALEK:  Yes, sorry about that.  Also

23    appearing for US Magnesium is Martin Krezalek from Blank

24    Rome LLP.

25              THE COURT:  Okay, hello.
```

```
 1                          PROCEEDINGS                    5
 2              MR. KREZALEK:  Good morning, your Honor.
 3              THE CLERK:  And we have a third party that
 4   dialed in.  Please make your appearance.
 5              MR. JOSHUA R. WEISS:  Good morning.  It's Josh
 6   Weiss appearing for The Renco Group.
 7              THE COURT:  Okay.  Good morning, everybody.
 8   And I apologize for the last-minute change.  I'm
 9   recovering from COVID.  I had hoped I would be testing
10   negative; but, alas, I am not.  So, out of an abundance
11   of caution, that's why I changed this to telephonic.
12              So before we get started, just a few
13   preliminaries.  Because we're on the phone, I ask that
14   you keep your phones on mute, unless you're speaking, to
15   eliminate background noise, and that you state your name
16   before speaking for clarity of the record.
17              I am making a recording of this conference so
18   that you can order a transcript, if you would like.
19   Also, I remind everyone that the Court's conference line
20   is open to the press and public on a listen-only basis,
21   and that court rules prohibit others from recording and
22   rebroadcasting court proceedings, including this one.
23   Violations of this rule may result in sanctions.
24              Okay, there's a lot of letters that the parties
25   have put in, and I want to address some of the -- at
```

```
 1                      PROCEEDINGS                    6
 2  least one of the easy ones first.  And then I thought
 3  that we'll address the discovery requests specifically
 4  related to financial statements and such.  That is going
 5  to be relevant, as well, to the third-party subpoena
 6  issue.
 7           So, first, in terms of the discovery schedule,
 8  I understand the parties are in agreement that an
 9  extension is needed to the discovery schedule through
10  April 5 -- well, actually, March 1st for the -- of 2024
11  -- for the filing of dispositive motions.  Is that
12  right, the parties are in agreement on this proposed
13  schedule?
14           MS. LEDUC:  This is Carolyn LeDuc for
15  defendants.  Yes, your Honor, that's correct.
16           MR. KRATENSTEIN:  This is Andrew Kratenstein
17  for the plaintiff.  That is correct.
18           THE COURT:  Okay, great.  So I will grant that
19  schedule extension, and I'll issue a scheduling order
20  after this conference reflecting those extensions of the
21  deadline.
22           MS. LEDUC:  Thank you.
23           THE COURT:  So next we have the issue
24  concerning plaintiff's request to compel US Mag to
25  produce financial statements, general ledger and trial
```

```
 1                        PROCEEDINGS                 7
 2   balance for three years preceding the events in
 3   September 2021 and to date.  And I want to hear a little
 4   bit more about that.
 5            First, I just have a couple of questions about
 6   the underlying facts, to make sure that I fully
 7   understand the issues.  As I understand it, the contract
 8   was entered into in 2020 for the supply of magnesium and
 9   that at some point, US Mag's equipment, and
10   specifically, a key turbine, broke down; and it was
11   unable to get parts or manpower to repair the turbine
12   and therefore could not fulfill the contract.  Is that
13   the crux of it; is a turbine the main piece of equipment
14   that's at issue?
15            MS. LEDUC:  Your Honor, if I may?  This is
16   Carolyn LeDuc on behalf of US Magnesium.  The jury will
17   learn that US Mag's manufacturing process is incredibly
18   complex, mechanically, electrically, chemically, in
19   every way; and the performance of every upstream piece
20   of equipment has a material impact on all the downstream
21   equipment such that if there's a problem upstream, that
22   can quickly lead to a disaster downstream.  And,
23   unfortunately, that's what happened in this case.
24   Despite US Mag's very best efforts, where labor and
25   supplies were not readily available, problems upstream
```

```
 1                         PROCEEDINGS                    8
 2   led to catastrophic damage downstream, so it became
 3   eventually a quite comprehensive failure of different
 4   parts of the plant.  And that's --
 5            THE COURT:  What parts of the -- so what was
 6   the catalyst -- what failure was the catalyst the caused
 7   this, and what was the -- in just a summary fashion,
 8   what do you say happened to the equipment?
 9            MS. LEDUC:  Yeah, there's a turbine generator
10   unit that went down --
11            THE COURT:  Generator unit?  I'm sorry, I'm
12   having a little trouble hearing you.
13            MS. LEDUC:  Yeah, I apologize.  I'll try to
14   speak up.  There's a turbine generator unit that went
15   down; and with that part down, with that piece of
16   equipment down, it led to downstream equipment failures
17   that eventually damaged the end of the process
18   electrolytic cells.  And that's ultimately what caused
19   US Mag to cease its production entirely over last
20   summer, in 2022.
21            THE COURT:  I see, so there were other -- how
22   did -- were there other specific -- is the turbine the
23   equipment failure for which you're claiming the *force*
24   *majeure*, that's the catalyst of these issues; or was
25   there some other failing?
```

```
 1                        PROCEEDINGS                   9
 2               MS. LEDUC:  The turbine failure was an issue.
 3    There was a lightning strike at the US Mag facility
 4    causing a subsequent generator problem.  The generator
 5    and turbine problems caused spray dryer problems.  The
 6    spray dryer problems --
 7               THE COURT:  Wait -- wait -- hold on.  Stop.
 8               The generator problem and then what did you
 9    say, stray dryer?
10               MS. LEDUC:  Spray dryer.  So US Magnesium's
11    process --
12               THE COURT:  Oh, spray, spray dryer?
13               MS. LEDUC:  Yes.  The process begins with
14    evaporating and condensing magnesium chloride from the
15    waters of the Great Salt Lake.  And a vital part of that
16    process is basically dehydrating magnesium chloride
17    brine in spray dryers.  And the spray dryer equipment
18    was not able to withstand some problems that arose
19    because of the turbine and generator issues.  So it just
20    created a downstream, basically dominos falling,
21    unfortunately.
22               THE COURT:  Okay.  So what was the maintenance
23    issue; was it the maintenance with the turbine
24    generator, or some of this other equipment, as well?
25               MS. LEDUC:  Well, your Honor, US Mag's position
```

```
 1                          PROCEEDINGS                    10
```

2  is there wasn't a maintenance issue.  US Mag's position

3  is that the maintenance was properly done.  It remains

4  to be seen what Kaiser alleges is the purported

5  maintenance failure.  But from US Mag's perspective,

6  there wasn't one.

7          THE COURT:  So why did the turbine go down?

8          MS. LEDUC:  That's a great question.  And the

9  experts are going to be competing over what the theories

10  of that are.  But there are some turbine blades on the

11  inside of the turbine that suffered catastrophic damage.

12  It's the kind of damage that US Mag has never seen in

13  the course of its history.  Our engineers are going to

14  testify and the mechanic will testify they haven't seen

15  it before of this nature.  But some blading appears to

16  have been damaged internally.  And I'm sure, like I

17  said, the experts will have competing views on what the

18  causes of that were.

19          THE COURT:  I see.  Okay.  So it was a unique

20  type of damage.

21          MS. LEDUC:  Yes, yes, your Honor.

22          THE COURT:  As I understand it, there were

23  three turbines, and the two others also were down.  Did

24  they suffer from the same blade damage?

25          MS. LEDUC:  No.  And I think that's factually

```
 1                        PROCEEDINGS              11
 2  incorrect.  There was one other turbine generator unit
 3  that was down.  And the other -- and the third unit was
 4  functional at the time the first turbine generator unit
 5  went down.  So units one and three were functional at
 6  that time.
 7          THE COURT:  And the other one went down because
 8  of why?
 9          MS. LEDUC:  That was the generator failure.
10  That turbine was fine, but the 03 generator was what had
11  issues because of electrical issues.  And, again, like I
12  said, there was a lightning surge at the facility; and,
13  again, I'm sure the experts will be competing with
14  opinions on what happened with the generator.
15          THE COURT:  I see.  Okay.  And so the third
16  unit that continued to function, but it couldn't -- you
17  couldn't utilize it because of these other downstream
18  failures?
19          MS. LEDUC:  No.  The third unit was functional
20  until there was a generator problem.  And with the
21  generator down, the turbine was still functioning and
22  producing hot air, but there wasn't the mobility of the
23  air that would have been there with the turbine
24  generator fully functional.  And so between the first
25  turbine going down and the third generator going down,
```

```
 1                        PROCEEDINGS              12
 2   those two things created this domino effect with
 3   downstream equipment and ultimately the electrolytic
 4   cells.
 5           THE COURT:  How long did it take for this
 6   complete failure of equipment to occur?
 7           MS. LEDUC:  Well, the initial turbine went down
 8   in -- had some problems in March of 2021.  And then
 9   while US Mag was trying to do everything it could to fix
10   those problems and address those problems, the generator
11   on 03 went down.  And when the efforts to address those
12   problems were not successful immediately, US Mag
13   declared force majeure.  And so, by the fall of 2021, I
14   believe late fall, US Mag was able to obtain the parts
15   and supplies necessary to fix turbine number one; but at
16   that point, the downstream issues had become a problem.
17   So once you get into early 2022, there were problems
18   with the spray dryer units and then eventually by the
19   summer of 2022, that's when the electrolytic cells had
20   gone down.
21           THE COURT:  Okay.  So are you producing any
22   magnesium at all?
23           MS. LEDUC:  At this time, I don't think so,
24   your Honor.
25           THE COURT:  And are you working to address the
```

1                              PROCEEDINGS                    13

2  problem so you can get production back up?

3          MS. LEDUC:  Yes.  It's my understanding that

4  that's going on on a continuing basis.

5          THE COURT:  Okay.  All right, thank you.  So

6  now let's go back to the issue of the financial

7  statements, general ledger and trial balance for three

8  years preceding September '21 and to date.  I'd like to

9  understand from Kaiser why this information is not only

10 relevant but proportional to the needs of this case.

11         MR. KRATENSTEIN:  Thank you, your Honor.  This

12 is Andrew Kratenstein from McDermott for the plaintiff.

13 The financial documents are relevant for a couple of

14 main reasons.  First of all, as you just heard Ms. LeDuc

15 explain, it is true that US Mag's equipment is all

16 related to each other, and there apparently was, at

17 least according to them, this domino effect.  We

18 contend, of course, that all of that was foreseeable

19 because they know how their machines work and they know

20 if, for example, generators go down, other pieces of

21 equipment downstream can go down, as well.  They also

22 knew, because they signed this contract -- as you

23 pointed out, the MSA was signed in October 2020.  That

24 is six months after COVID starts, and they declare *force*

25 *majeure* in September 2021, about 18 months after COVID

```
 1                        PROCEEDINGS                14
 2  starts.  So they do know already at the time they sign
 3  this contract, that there are supply chain and other
 4  issues that may affect the ability to get spare parts,
 5  etc., to repair things.  And it's clear from the
 6  documents that they have produced that they did not have
 7  those parts; that they were, as their documents put it,
 8  robbing parts from one turbine to stick into another
 9  turbine in order to repair it.
10            And the question, going out of your question
11  why are the financial documents relevant to that, well,
12  one of the issues in this case is why were they in that
13  position in the first place.  Were they making -- they
14  made, at least from what we've been able to piece
15  together -- various business decisions that led to the
16  situation that they were in, for example, building a
17  lithium plant when they knew that they needed money to
18  maintain and repair the magnesium plants.
19            THE COURT:  Well, wait a minute.  Just --
20            MR. KRATENSTEIN:  The documents --
21            THE COURT:  -- because they didn't fulfill the
22  magnesium doesn't mean you get to go and basically sit
23  in the shoes of the board of directors of the company
24  and decide where it should invest its money or not.
25  That's what you're --
```

```
 1                          PROCEEDINGS                15
 2              MR. KRATENSTEIN:  Oh, we agree.
 3              THE COURT:  -- saying.
 4              MR. KRATENSTEIN:  No, we agree with that.
 5              THE COURT:  That's what you're saying.  So I
 6   guess --
 7              MR. KRATENSTEIN:  Well --
 8              THE COURT:  -- why wouldn't the financials just
 9   related to the maintenance of equipment, why wouldn't
10   the budget -- you know, why wouldn't discovery just on
11   how the equipment was maintained, how it was supposed to
12   be maintained, what the cost for that maintenance is --
13   maintenance and repair and whether the budget met those
14   needs for that, why isn't that sufficient for your
15   needs?
16              MR. KRATENSTEIN:  Well, a few reasons.  We
17   agree, of course, we're entitled to that.  But the
18   documents that we received so far indicate that they
19   were delaying or deferring maintenance projects for at
20   least 10 years.  We do have those documents.
21              But then we think that the jury should also be
22   able to hear, because they're presumably going to say
23   along the lines of, "Look, we did the best we could with
24   the resources we had," we think the jury should be
25   entitled to hear, well, not really; they could have
```

1
2  taken resources that they used to build a lithium plant
3  and put it into magnesium plants.  They could have taken
4  money that they used to distribute up to its owner and
5  us that to repair the magnesium plants.  But they chose
6  not to do that.  And so we think that that's all
7  relevant, that the jury should see the full picture of
8  what US Mag was doing.  We're not second-guessing what
9  they did.  They made business decisions; they're
10 entitled to make those business decisions.  But, you
11 know, with all respect, that's not what we're saying.
12 What we're saying is when you make those business
13 decisions and then it turns out that you don't have
14 enough money to repair or maintain your plants, then you
15 have assumed the risk that what happened in this case, a
16 catastrophic equipment failure, you assumed the risk
17 that that was going to happen.
18          THE COURT:  So why isn't it sufficient --
19          MR. KRATENSTEIN:  And so that's what --
20          THE COURT:  -- if you already -- if you already
21 have information that says that they didn't fund the
22 cost of maintenance and they delayed, why isn't that
23 sufficient?  Why is it proportional to then explore
24 every other business decision that the company made?
25 That's what you're seeking to do.

```
 1                        PROCEEDINGS                17
 2            MR. KRATENSTEIN:  Well, in terms of proportion,
 3  we're not asking for every document they have about
 4  every business decision that they made.  We're asking
 5  for --
 6            THE COURT:  Well, your document requests say
 7  "all documents."  They're not --
 8            MR. KRATENSTEIN:  We would --
 9            THE COURT:  They say "all documents."  So your
10  requests are very broad.  I don't think that they're
11  narrowly tailored.
12            So, again, why is it proportional to explore
13  every single other decision made by the -- financial
14  decision made by the company?
15            MR. KRATENSTEIN:  Well, to clarify on the
16  proportionality issue, your Honor, what we're asking
17  for -- and if it wasn't clear, I'll make it clear
18  now -- in terms of the -- and the redaction issue is
19  separate and we'll cover that separately -- but in terms
20  of documents that we're asking them to produce that they
21  haven't already agreed to produce, we are asking for the
22  financial statements, which are a discrete set of
23  documents, and the trial ledger.  And so that's what
24  we're asking for.  We're not asking for every single
25  email about every decision that they ever made and why
```

```
 1                        PROCEEDINGS              18
 2   they made it.  So, you know, just to clarify, we're not
 3   asking for a lot of documents.  We want to just see the
 4   basic, the most basic financial documents, which are
 5   your financial statements, which explain how they were
 6   spending money.
 7            THE COURT:  Okay.
 8            MR. KRATENSTEIN:  Let me just -- one other
 9   thing -- and this goes to the Renco issue, as well --
10   whether money was being distributed up to Renco is
11   relevant for another reason, which gets to whether the
12   damages limitation can be vitiated.  I know you've read
13   the initial dispute between the parties about whether
14   the consequential damages limitation in this contract
15   applies, and that's now before Judge Koeltl.  But one of
16   the issues that the parties are engaged on is whether,
17   assuming that those apply -- and there's a dispute as to
18   whether they do -- to our profit, that clause can be
19   vitiated because of gross negligence, willful misconduct
20   and/or bad faith.  And we would submit that, if money is
21   being distributed up to the owner of the company at a
22   time when US Magnesium document say that in substance
23   the company is starving for capital investments, now you
24   at least arguably cross the line from negligence into
25   gross negligence, etc.  And we're not just fishing here;
```

```
 1                        PROCEEDINGS                 19
 2   I mean, we have emails that say that the company thought
 3   it could be turning a corner financially in 2022, and
 4   the president of the company was asking everyone for a
 5   list of projects to work on while the money is good, and
 6   then one of the other managers says that's really good
 7   news if Ira, who's Ira Renner -- that's the chairman of
 8   Renco -- doesn't, quote, "skim off the money first."
 9            So this isn't, you know, just some fishing
10   expedition where we don't have any basis to believe that
11   this may have happened.  Plus, US Mag itself admitted in
12   its letter to you in response to our letter on the
13   financials, that at least in 2016 it did distribute
14   money up to Renco.  Well, that's at a time when --
15            THE COURT:  Meaning so in 2016 it paid a
16   dividend; is that what you're saying?
17            MR. KRATENSTEIN:  Well, according to their
18   letter, it either paid a dividend or some form of
19   distribution.  I'm not sure exactly what form that took.
20   But, according to the letter that --
21            THE COURT:  And why is one dividend in 2016,
22   which is a number of years prior to the failure of the
23   turbine, why is that relevant?
24            MR. KRATENSTEIN:  Because the documents that we
25   received also say that for at least a decade before
```

```
 1                         PROCEEDINGS                    20
 2   2021, so in other words, since at least 2011, US Mag was
 3   delaying or deferring maintenance projects.  So smack in
 4   the middle of that period -- and, by the way, we don't
 5   know if it's just one -- what US Mag's letter said was
 6   we have not -- in substance, distribution has not been
 7   made to Renco since 2016.  So, presumably, they made
 8   some in 2016.  We don't know how many were made earlier.
 9   But smack in the middle of the period, the decade where
10   they say they're delaying and deferring maintenance and
11   redevelopment projects at the plant, they are also
12   making distributions up to their owner.  And we think
13   that the jury --
14           THE COURT:  But isn't it enough that they're
15   delaying and deferring -- isn't it enough that they're
16   delaying and deferring maintenance, isn't that enough
17   for you to say they can't claim force majeure because
18   this is their own fault for delaying and deferring
19   maintenance?  Don't you already have enough?
20           MR. KRATENSTEIN:  It may -- I hope so, but of
21   course, none of us know what will happen at trial.  But,
22   again, I would say that this issue is not only relevant
23   to negligence, which would vitiate their force majeure
24   declaration because they were negligent; it also goes to
25   whether any damages limitations can apply, because now I
```

```
 1                        PROCEEDINGS                   21
 2   think -- again, when you're crossing from not spending
 3   enough money on plants and equipment -- perhaps because
 4   you don't have it for some reason, whatever the reason
 5   is -- but then the reason, or at least a reason, is,
 6   well, we don't have the money to repair the equipment
 7   because we're making distributions to our owner, now I
 8   think you're, at least again arguably, crossing the line
 9   from negligence to gross negligence and perhaps beyond.
10   And that goes to the enforceability, not just whether
11   the force majeure is enforceable and valid, but whether
12   the damages limits that they seek to apply to us even if
13   the force majeure is valid, whether those damages limits
14   can be applied here.
15           THE COURT:  Well, on what basis are you
16   asserting that defendant delayed or deferred maintenance
17   because it decided instead to pay a dividend?
18           MR. KRATENSTEIN:  Well, we don't know because
19   we haven't gotten the documents if they delayed or
20   deferred maintenance.
21           THE COURT:  What explanation have you received
22   as to why there was a deferral of maintenance?
23           MR. KRATENSTEIN:  Well, I'll read to you -- I
24   have a memo; the best I can tell you is a memo that we
25   have.  It's a memo from November 2021, which is a couple
```

1

2   of months after -- a little bit less than actually two

3   months after the *force majeure* -- about a month after

4   the *force majeure* was declared.  It says in substance

5   that, "US Mag's been impacted by several significant

6   business issues over the last 10 years."  And it goes on

7   to say that, "These issues have required the company to

8   remain very frugal regarding capital investment and

9   modernizations," and that, "a number of projects have

10  been deferred or delayed during this economic climate."

11  And then it goes on to list various project, by the way,

12  including a project to upgrade the gas turbines that

13  you've heard about.

14        Then we have the email that I told you about

15  where we have at least one high-ranking US Mag official

16  later in time saying when US Mag is thinking things

17  might turn around, that would be great but, you know,

18  hopefully the owner won't take the money that we need to

19  fix the plant.

20        Now, we haven't taken depositions yet.  I

21  intend to, of course, asking about these documents.  But

22  we think we're entitled to get the documents so that we

23  can ask the US Mag witnesses the question.

24        THE COURT:  Okay.  I'll hear next from US Mag.

25        MS. LEDUC:  Thank you, your Honor.  There are

1                          PROCEEDINGS                        23

2   several points that I'd like to respond to.  First and

3   foremost, US Mag has never asserted as a defense a lack

4   of financial resources.  And the case cited by Kaiser on

5   that issue, on the so-called relevance of financial

6   resources actually says just exactly the contrary.

7   Financial resources of a defendant has nothing to do

8   with the efficacy of a *force majeure* defense.  It has

9   nothing to do with it.  In fact, the case cited by

10  Kaiser, the plaintiffs were seeking summary judgment on

11  the basis that that was the defendant's defense, lack of

12  money.  And the Court said, look, I agree.  Lack of

13  money is not a defense.  Lack of money is foreseeable;

14  it's not a defense.  But, plaintiff, I'm not granting

15  you summary judgment, not because there are questions of

16  fact and financial ability, but because the plaintiff

17  hadn't met its burden of proof to show that performance

18  under the agreement was even physically possible at the

19  time.  That was the basis on which summary judgment was

20  denied.

21          So the cases -- and I assume -- I'm sure that

22  Mr. Kratenstein and his team are very competent on

23  Westlaw and Google and Lexis and every research

24  database.  They haven't come forward with a single case

25  anywhere in American jurisprudence to support the

```
 1                       PROCEEDINGS                    24
 2   relevance of a defendant's financial condition with
 3   respect to force majeure.  It's not out there.  And what
 4   is out there -- and we could cite legions of these cases
 5   -- is that financial information is not discoverable.
 6   It's not just irrelevant; it's not discoverable.  And
 7   the reason for that, your Honor, is that when we get to
 8   trial, it's not only not relevant; it stays out under
 9   Rule 403.  And not only does it stay out under Rule 403,
10   but courts will often also give jury instructions that
11   instructs the jury explicitly you are not to take into
12   account the wealth or poverty of any party in this
13   action, because it is not relevant.  The Courts are
14   extremely protective of financial information; and
15   discovery, prejudgment discovery of a defendant's
16   assets, is completely improper.  And that is what's
17   going on here.  Make no mistake; that's what's going on
18   here.
19           The allegation that money was distributed to
20   the parent company, totally unfounded.  In fact, in
21   written discovery, US Mag asked Kaiser, you've got this
22   line in your Complaint that says US Mag's an
23   instrumentality of Renco.  Provide every document you
24   relied on for making that claim.  And Kaiser's response
25   was that issue is not relevant to this case and not
```

```
 1                        PROCEEDINGS                25
 2   likely to lead to discovery of any relevant evidence.
 3   We could not agree more.  US Mag's financial situation,
 4   its relationship with Renco, totally unrelated to the
 5   issues in this case.  So your Honor asks isn't it enough
 6   whether the equipment was maintained or not; yes, it is.
 7   In fact, that's the only relevant issue in US Mag's
 8   force majeure defense, was the equipment reasonably
 9   maintained, were the equipment failures reasonably
10   beyond or beyond US Mag's reasonable control -- I think
11   that's what the language of the contract is.  But that's
12   the issue in the case.  So financial information, oh, we
13   just want to dip our feet into the water of US Mag's
14   financials, we just want to probe and see whether Ira
15   Renner took some money away from US Mag.  No.  It's a
16   fishing expedition.  They're trying to bring Renco into
17   this suit.  Because if they can bring in Renco, maybe
18   they have some collectability for judgment.  That's
19   what's going on in the mind of Kaiser, and it's
20   completely improper as a basis for discovery.  I'm sure
21   Mr. Weiss would appreciate addressing that issue, also.
22             THE COURT:  Well, did US Mag pay dividends to
23   Renco?
24             MS. LEDUC:  No.  In fact, we said in the
25   pleadings since 2016 there hasn't been any dividend.
```

1                           PROCEEDINGS                    26

2  And, again, I'll defer to Mr. Weiss on that issue

3  because he's more familiar with that than I am.  But the

4  allegation that Renco is skimming money off the top of

5  US Mag is completely factually unfounded; there is no

6  factual evidence in support of that at all.

7          THE COURT:  And is US Mag, it's -- is an LLC --

8  is it taxed as a disregarded entity such that it's a

9  division of Renco?

10          MS. LEDUC:  Maybe Mr. Weiss can answer that.

11          MR. WEISS:  Your Honor, this is Josh Weiss.

12  Yes, US Mag is a disregarded entity for tax purposes.

13  But it is obviously its own separate corporation with

14  its separate manager.  Ron Thayer, who is the president

15  of US Magnesium, is also the manager of US Magnesium

16  LLC.

17          THE COURT:  Well, doesn't that make some

18  difference?  If it's a disregarded entity, doesn't that

19  allow some greater flexibility as to decision-making at

20  US Mag in terms of influence of Renco?

21          MR. WEISS:  Your Honor, with all due respect,

22  absolutely, positively not.  That is -- a disregarded

23  entity is solely a tax fiction which allows entities

24  within a structure to be taxed as a single entity.  It

25  has no bearing whatsoever in any jurisprudence anywhere

```
 1                      PROCEEDINGS                    27

 2  in this country on the basic fundamental principle of

 3  corporate separateness.  And corporate separateness is

 4  to be respected unless there are allegations.  And

 5  whether it's Delaware or New York law, that there is

 6  some extreme element of control over the operations of

 7  the entity and that the entity is being used for some

 8  form of fraud or injustice.

 9             THE COURT:  Okay, I'm going to go back to US

10  Mag.  Are there other points you want to make on

11  proportionality?

12             MS. LEDUC:  Well, and let me just address one

13  issue really quickly before proportionality -- well, I

14  guess I'll go straight to the proportionality issue.

15  No, it's not proportionate.  And mostly for the reason

16  is not relevant.  I mean, as your Honor asked, wouldn't

17  it be enough for them to get information about what

18  money was spent on maintenance.  If you think that, you

19  know, X maintenance should have been done and wasn't

20  done, fine.  But decisions made about where money was

21  spent instead of that, whether it's employee benefits or

22  doughnuts for the breakroom, not within the realm of

23  anything that Kaiser can come in and ask the jury to

24  second-guess.

25             But the other point that I wanted to make,
```

1
2    Kaiser's counsel said that alleged bad acts on the part
3    of Renco -- mind you, not even on the part of the
4    defendant but on the part of Renco's shareholder -- can
5    somehow be used to eviscerate a consequential damages
6    waiver in a contract, that is completely erroneous just
7    as a matter of law.  This is UCC case.  The
8    enforceability of a consequential damages waiver is a
9    matter of statute.  It's not a matter of common law;
10   it's a statute.  And the statute is very plain:
11   consequential damages can be waived unless -- one basis
12   -- unless there's a showing of unconscionability, which
13   as your Honor is probably aware, is an extremely high
14   burden.  In this case Kaiser hasn't alleged
15   unconscionability, it hasn't argued unconscionability.
16   It's not at issue in the case at all, and it's certainly
17   not the same standard as bad faith or so-called gross
18   negligence.
19           And, by the way, the cases that Kaiser has
20   cited on gross negligence, number one, not UCC cases;
21   but the one case they added to their briefing, just in
22   the most recent round, they purported to say, oh, you
23   know, consequential damages waiver does constitute the
24   kind of waiver that gross negligence can overcome.  If
25   you read that case, it was a tort case; it wasn't a UCC

```
 1
 2   case. It was a contract case for services, and there
 3   were separate tort claims being litigated.  So it's
 4   totally distinguishable from this case.  It wasn't
 5   governed by statute as this case is.
 6            So that whole idea that you can somehow pin
 7   wrong conduct on US Mag, let alone Renco, let alone
 8   Renco's shareholders to somehow eviscerate a contractual
 9   agreement that consequential damages would be waived is
10   just not supported under the law.
11            THE COURT:  Okay.  And Kaiser is not disputing
12   that the UCC applies, is it?
13            MS. LEDUC:  I don't believe so.
14            THE COURT:  Okay.  In my view, the financial
15   statements, general ledger and trial balance are not
16   relevant to this case.  And, certainly, even if they
17   were marginally relevant, they're not proportional to
18   the needs of the case.  So I am going to deny the
19   request.  And I'll issue an order on this after this
20   conference.
21            Now let's talk about the motion to compel
22   because some of the items that plaintiff is seeking to
23   compel production of from Renco relate to these
24   financials, so my ruling also will apply to that motion
25   to compel.  But I think that there is some separate
```

PROCEEDINGS                          30

1    information.   It sounds like there's, from the letters

2    that were written, it sounds as if US Mag would send

3    monthly memos, management presentations to Renco about

4    its operations and so forth.   And I imagine that there

5    would be some number of presentations and potentially

6    minutes from meetings at Renco that discuss the

7    particular equipment failures and the decision to

8    declare a *force majeure* that may not be completely

9    within the hands of US Mag.   So I'd like to hear from,

10   first from Renco about what unique documents it might

11   have on these issues.

12        MR. WEISS:   Thank you, your Honor.   Josh Weiss

13   from The Renco Group.   Your Honor, it is highly unlikely

14   that Renco has unique documents on this issue.   And the

15   reason is very simple.   Renco is an investment holding

16   company.   We own businesses; we do not operate those

17   businesses.   We do not have the technical expertise to

18   run a magnesium plant.   We have no ability to say what

19   repairs should be done when, what needs to be fixed, how

20   it needs to be fixed.   It's not within our area of

21   competence.   And our model is that we rely on our

22   management teams to make those decisions.   And that's

23   why Ron Thayer is the manager of US Magnesium LLC, and

24   he is essentially the chairman of the board, and he

```
 1                        PROCEEDINGS                    31
 2   makes those decisions.  And for that reason, the
 3   information that Renco has about operations at US
 4   Magnesium is information that is provided to us by US
 5   Magnesium, as you pointed out, in the form of monthly
 6   management presentations.  And I will tell you, for
 7   example, we did not even know that US Mag was declaring
 8   force majeure until after it happened.
 9           So is it possible that there are unique
10   documents?  Certainly, it's possible.  If there are, it
11   is likely a very small quantity, and it will require
12   some needle-in-the-haystack type of looking, and that is
13   why in my correspondence with Mr. Kratenstein I
14   repeatedly pointed out that overwhelmingly the
15   information that he is seeking from Renco is the same
16   information that is in the hands of US Magnesium; and to
17   require us to search for this needle in the haystack,
18   which really cumulatively does not, even if it were
19   there, it's hard to imagine how it adds to the claim
20   they are bringing or the theory of the claim that they
21   are bringing, and as such, it is unduly burdensome on
22   Renco.
23           THE COURT:  Why do you say it's needle in the
24   haystack if it's just -- wouldn't it just be these memos
25   and minutes where you were discussing when the learning
```

```
 1                        PROCEEDINGS                    32
 2   of the declaration of the force majeure?  I mean, you
 3   stated you only learned after the fact.  There must be
 4   some document you're relying on to make that statement.
 5              MR. WEISS:  Well, with all due respect, your
 6   Honor, I don't have -- I know for a fact that we don't
 7   have memos that were generated here at Renco about those
 8   issues.  We don't have minutes of meetings that are held
 9   with US Magnesium.  US Magnesium, as we discussed,
10   prepares a presentation for a monthly management review
11   that is presented to us generally in person.  And there
12   are discussions that take place on all topics.  I
13   imagine that -- and, again, those are presentations
14   prepared by US Mag and provided to us.  So perhaps
15   needle in a haystack wasn't the greatest analogy, but
16   these are not documents -- the documents you describe
17   and that Mr. Kratenstein theorizes exist do not in large
18   measure.  Again, it's not to say that there isn't one
19   here or there or some here or there, but that's, in my
20   understanding and based on the interviews that I've
21   conducted of the business folks who interact with the US
22   Mag folks, that is not our practice.
23              THE COURT:  So let me hear from Kaiser.  Did
24   you get these business presentations?  Did US Mag
25   already provide to you the information that it sent up
```

```
 1                          PROCEEDINGS                    33

 2   to Renco about these issues?

 3              MR. KRATENSTEIN:  Well, I can only tell you

 4   what I know, your Honor.  What I know is that until

 5   yesterday we received a grand total of, you know, five

 6   email chains between US Mag and Renco -- yesterday,

 7   literally.  I guess, actually technically, it was the

 8   day before yesterday -- I apologize -- the day before

 9   yesterday, we received a production of monthly reports,

10   heavily redacted monthly reports -- and I know we'll get

11   to that -- that are reports that were sent from US Mag

12   to Renco.  I don't know if that's a universe, I don't

13   know if that's a universe of documents that were sent

14   between US Mag and Renco.

15              But our position on this is a couple of things.

16   Number one -- and we do find it somewhat inconceivable

17   that, given that US Mag asserts that Renco has invested

18   hundreds of millions in US Mag -- and, obviously, as you

19   just heard, it owns US Mag, it's a disregarded entity

20   for tax purposes -- that there aren't nonduplicative

21   documents within Renco, internal communications, talking

22   about this catastrophic, what everybody agrees is a

23   catastrophic event at US Mag that you heard at the top

24   of this call has led to the complete cessation of

25   magnesium production for months, you know, that there
```

```
 1                          PROCEEDINGS              34
 2   are no emails about this internally, there are no emails
 3   -- I mean, it's just -- you know you can imagine we were
 4   kind of surprised to hear that.
 5            And I'm also surprised to hear -- and you heard
 6   just now Mr. Weiss say, well, it's highly unlikely we
 7   have nonduplicative documents.  Well, have you looked?
 8   Because we agreed in December that they were going to
 9   run search terms over their documents, the typical thing
10   we all do in litigation, particularly by the way,
11   they're not just some nonparty; they own the defendant.
12   So they agreed to run search terms, and the only reason
13   I brought this to your Honor is because, candidly, we
14   believed they were giving us the runaround because they
15   haven't produced any documents and we're now in the
16   middle of February.
17            So, you know, we think we're entitled to the
18   documents.  And, by the way, that's even -- even if they
19   are, quote, "duplicative."  As I'm sure your Honor
20   knows, duplicative documents, communications between two
21   parties or two nonparties or a nonparty and a party, get
22   produced all the time.  And there's case law -- the case
23   law's actually cited -- we cited it for Mr. Weiss in the
24   letters that I sent to him that are attached to his
25   letter to the Court saying just because an email or
```

1                            PROCEEDINGS                    35

2 something may be duplicative doesn't mean you don't have

3 to produce it.  That gets produced all the time.

4           And in this case, that's important for a couple

5 of reasons.  Number one, presumably, US Mag is sharing

6 with Renco what US Mag considers important information.

7 So the fact that Renco has it is itself relevant.  And,

8 second, we have had significant issues with US Mag's

9 production.  I won't bore you with all the details.  But

10 one of the issues has been, for example, they have not

11 produced back to us all of the communications between US

12 Mag and Kaiser that we have produced.  And so the best

13 way to make sure that you're getting both sides of a

14 conversation is to get both sides of the conversation.

15 And that's all we're asking, and we don't think it's

16 unduly burdensome.  We don't think -- you know, we had

17 been told, well, there's hardly anything.  Well, if

18 there's hardly anything, run the search terms and

19 produce the documents.

20           THE COURT:  Okay, so in terms of the subpoena,

21 I think there are things that the parent company may

22 have that are unique that bear on information about the

23 maintenance and upkeep or deferral of maintenance and

24 repair of the equipment that failed, as well as the

25 actual failure and the declaration to declare *force*

```
 1                      PROCEEDINGS                36
```

*majeure* with respect to this and the cessation of the

magnesium as a result of these catastrophic failures.

So what I'm going to direct the parties to do is to meet

and confer to narrow the requests and objections.  And

what I'm going to ask you to do is to write me a letter

in two weeks and let me know how you've narrowed down

the dispute, and then I will address those issues.  But

I think you can do a little bit more work, and I think

that there are some things that Renco has and can

produce that would be relevant.  So I want you to meet

and confer over the next two weeks and then send me a

joint letter with what are the narrowed-down disputes.

          MR. WEISS:  Understood, your Honor.  Thank you.

          THE COURT:  Now, in terms of the redactions,

let me understand that nature of the redactions, first

from Kaiser's perspective.  You said you received copies

of these monthly management reports.  Do the unredacted

portions concern investment in and repair and

maintenance of these various machinery, manpower needed

to fix it and those related issues?

          MR. KRATENSTEIN:  If I understand your Honor's

question, I think the answer is yes and no.  So there is

certainly some unredacted information about that.  But

there also appears to be redacted information about

```
 1                        PROCEEDINGS              37

 2  that, too.  Just to give one example -- and, again, the

 3  redactions are heavy, so it's hard to tell exactly

 4  what's been redacted.  But it appears, for example, that

 5  they redacted whether their capital spending was up or

 6  down, you know, in a particular month and by how much.

 7  Well, that's obviously relevant; capital spending goes

 8  to maintenance and repairs.

 9          The other items that are redacted -- it's very

10  hard for me to tell -- there are just headings about the

11  general topics, but then, you know, giant blocks of

12  redactions all over the document.  So, as you know, we

13  contend they shouldn't be redacting anything under the

14  case law, but even what they have redacted appears to be

15  relevant.

16          THE COURT:  So, normally if there's a

17  protective order in place, redactions are not going to

18  be appropriate unless there's something, you know,

19  particularly sensitive.  And I'd like to understand US

20  Mag's position here, because you do have an option, too,

21  of marking some things Attorney's Eyes Only, as opposed

22  to just redacting.  So there's multiple protections you

23  can have under a protective order that wouldn't involve

24  redacting.

25          MS. LEDUC:  This is Carolyn LeDuc.  Thank you,
```

1                          PROCEEDINGS                        38

2    your Honor.  Let me just address that question.  So

3    there's three kinds of information that's been redacted

4    in general.  It's financial information, so it's income,

5    loss, balance sheets, those kinds of things;

6    environmental information; and information about parts

7    of US Mag's operations that are unrelated to the

8    production of magnesium.  So those three categories of

9    information.  But what you'll discover, your Honor, is

10   that Kaiser's arguments for so-called relevance for all

11   of these issues go back to the issue of US Mag's

12   decisions about its money.  So environmental

13   information, they want to know that because the theory

14   is well, maybe US Mag was spending money on remediation

15   or maybe US Mag had to settle some environmental

16   lawsuit, and we should be able to tell the jury that US

17   Mag spent money on the environmental issues rather than

18   equipment maintenance.  No, that's not a basis for

19   relevance.  And then information about parts of US Mag's

20   operations unrelated to magnesium, well, as you heard,

21   US Mag's producing lithium, and jeez, we should be able

22   to see everything that US Mag did on the lithium side of

23   the facility so that we can show that US Mag shouldn't

24   have been spending money on lithium; it should have been

25   spending it on magnesium.  That gets back into all the

```
 1                         PROCEEDINGS                    39
 2   issues we were just addressing on financial information.
 3            So if US Mag's monthly management reports are
 4   sending Renco, as they were, financial information that
 5   we just talked about the irrelevance of, the prejudicial
 6   nature of the -- it doesn't come in, it's prejudicial,
 7   it's going to be abused and misused in this case to
 8   create this case into something it is not about and
 9   should not be about and cannot be about as a matter of
10   law.  The question is is Kaiser just going to get that
11   information, anyway.  Our position has been it should be
12   redacted.  You know, it sounds crazy, your Honor, but
13   there could not be any hotter -- well, this part of it
14   doesn't sound crazy -- there could not be any hotter,
15   more controversial issue right now than environmental
16   issues.  And Kaiser, I think, is really hoping it can
17   fish through the environmental information and find some
18   way to turn this case into a referendum on US Mag's
19   environmental record.  Frankly, your Honor, Kaiser is an
20   aluminum facility, US Mag is a magnesium facility.
21   These companies deal with environmental issues.  That is
22   an issue that could be extremely hot button for the
23   jury.  Crazy as it sounds, we've seen other parties try
24   to do the same thing in other cases.  It's frankly
25   astonishing how far these parties will go to try to get
```

```
1                        PROCEEDINGS                40
2  environmental issues before a Court because they're so
3  prejudicial in the minds of modern juries.
4         And so it's really beyond dispute environmental
5  issues are not relevant to the case.  Kaiser hasn't
6  propounded a single document request addressing
7  environmental issues or the lithium production, none of
8  that.  So why are we going to then hand Kaiser all of
9  the information that we just disputed the relevance of
10 in management reports when it's just -- it's not
11 relevant?  And so what you see in the cases that address
12 the redactions is Courts will just go through and say,
13 all right, this is not relevant, it can stay redacted;
14 and this part, I find it relevant, it can come in.
15        So we've got monthly management reports that
16 were delivered to Renco, we've got engineering reports
17 that deal with partly magnesium but partly lithium.
18 They don't need the lithium information.  They're not
19 going to turn the information about lithium into some
20 basis again for second-guessing US Mag's financial
21 decisions and (indiscernible) the only conceivable basis
22 on which anything about lithium or the environment could
23 even be stretched into this case.  And it shouldn't be
24 as a matter of law.  It's prejudicial as well as
25 irrelevant.
```

```
 1                        PROCEEDINGS              41
 2              So it's not just a question of, you know, can
 3    we keep it to Attorney's Eyes Only; it's frankly the
 4    attorneys who are going to try to abuse this
 5    information.  So that's US Mag's position.  The
 6    information's just not relevant.  And handing it to
 7    Kaiser in these monthly management reports is just
 8    inviting them to do all of the things that Courts rankle
 9    at over the financial issues, because it's all -- it all
10    boils down to how US Mag spent its money, all of these
11    issues.
12              THE COURT:  Have you produced just the
13    maintenance budget?
14              MS. LEDUC:  Um --
15              THE COURT:  Is that segregated, or just the
16    spending on maintenance and repair?
17              MS. LEDUC:  Yeah, I don't -- that's not the
18    kind of thing we would have redacted.  Information that
19    was put into capital expenditures for magnesium, I think
20    that information was produced unredacted.  And if it
21    deals with magnesium, fine, it comes in.  But when
22    counsel for Kaiser talks about capital spending being an
23    issue that's clearly relevant, it's not.  What US Mag
24    spent on its capital expenditures for parts of the plant
25    having nothing to do with magnesium is not relevant.
```

```
 1                     PROCEEDINGS              42
 2              THE COURT:  How many of these reports are there
 3   that are redacted?
 4              MS. LEDUC:  I think there are a few hundred --
 5   they're monthly management reports, so they're delivered
 6   once a month.  And I believe there were several years of
 7   reports that Kaiser requested.  So it's going to be --
 8   it's going to be a few hundred pages of documents.
 9              THE COURT:  I'd like to see a sample of the
10   unredacted with the redacted portions highlighted.  Can
11   you submit three sample reports to me?
12              MS. LEDUC:  Yes.
13              THE COURT:  And what I'm going to ask is I'm
14   going to ask Kaiser to identify the three to be
15   submitted to me in camera.  So Kaiser has the redacted
16   ones.  So, Kaiser, by tomorrow identify the three
17   reports that you want submitted to me in camera.  And
18   then by Friday I want US Mag to email me for in camera
19   review the unredacted ones identified by Kaiser.  And
20   obviously, that will be ex parte, in camera.  And I will
21   take a look at what the redactions are.
22              MS. LEDUC:  Okay.  And just to clarify, your
23   Honor, there are additional documents that have been
24   redacted, but they've been redacted for the same
25   reasons.  The monthly management reports I think should
```

1                          PROCEEDINGS                    43

2   be fairly simple to analyze because they follow the same

3   pattern.  If you've seen one, you've seen the template

4   for all of them.  They're basically the same information

5   but, you know, updated each month.

6            The other main packet of information or type of

7   documents that are at issue on the redaction is

8   engineering reports.  They likewise follow consistent

9   patterns such that if you've seen one, you kind of know

10  what all of them look like.  They contain some

11  information relevant to US Mag's magnesium production,

12  but some information relevant to lithium production,

13  which we would maintain is not relevant.

14           THE COURT:  Well, Kaiser can designate either a

15  management report or an engineering report.

16           MS. LEDUC:  Okay.

17           THE COURT:  So three of them, and I'll take a

18  look.  But since Kaiser's objecting, it can identify the

19  reports it wants me to take a look at.  And --

20           MS. LEDUC:  Okay.

21           MR. KREZALEK:  Your Honor --

22           THE COURT:  Go ahead.

23           MR. KRATENSTEIN:  Sorry, your Honor.  No,

24  sorry, your Honor.  (indiscernible).  I just wanted to -

25  - may I respond briefly?  I appreciate your order and

```
 1                         PROCEEDINGS                    44
 2   will, of course, comply, but --
 3             THE COURT:  Sure.
 4             MR. KRATENSTEIN:  Oh, thank you.  What you just
 5   heard from Ms. LeDuc sounded like an argument on a
 6   motion in limine.  You know, if they want to argue
 7   before the trial that there are certain things that are
 8   off limits before the jury, you know, they'll have every
 9   opportunity to do that.
10             THE COURT:  Oh, sure.  I -- the evidentiary
11   rules are not pertinent to what is discoverable.
12   Relevance is broad under Rule 26.  So I understand that
13   point.
14             MR. KRATENSTEIN:  Great.  And, you know, and I
15   know you also know the rules.  I mean, there's really no
16   compet -- we're not competitors.  This isn't personal
17   information.  As you know, it's highly unusual to redact
18   documents, particularly this extensively.
19             And, by the way, just last thing and then I'll
20   stop.  You know, we've produced a lot of documents in
21   this case, Kaiser has.  We've produced, you know,
22   actually multiples more than US Mag has.  We haven't
23   redacted a single document for relevancy.  And there is
24   tons of information in these documents that has nothing
25   to do with this case, because we know it's improper to
```

```
 1                          PROCEEDINGS                    45

 2   do that.  And so, you know, again, we think that the law

 3   is very clear on this -- we know you're familiar with it

 4   -- that there are really very limited circumstances when

 5   they can redact this type of information.  And it's

 6   improper.  So, anyway, that's all I wanted to say on

 7   that topic.

 8             THE COURT:  Okay.  Thank you.  I think I

 9   understand the parties' arguments, and I'll just take a

10   look at these redactions.

11             Then, finally, there's the issue of the motion

12   to stay discovery on consequential damages.  What I'm

13   going to do is I'm going to schedule another conference

14   within the next 30 days.  I am not inclined to stay

15   discovery on consequential damages to the extent that

16   doing so would require witnesses to be redeposed unless

17   you're saying that the witnesses would have more than

18   one day of deposition anyway and that the information is

19   clearly discrete.  So I want to -- what I'd like to do

20   is to understand a little bit better what the overlap is

21   because I don't want to have inefficiencies in

22   discovery.  And if redepositions can be avoided, there

23   may be certain discovery that not -- that can be delayed

24   rather than stayed pending a ruling on the motion to

25   dismiss.  So I want to understand what really is
```

```
 1                        PROCEEDINGS                    46
 2  overlapping and what really would be discrete on the
 3  consequential damages issue.  And I'm not sure that's
 4  completely fleshed out in the letters that I read that
 5  you submitted.  So I want you to meet and confer about
 6  what is overlapping and what is discrete and what could
 7  be reasonably delayed given the extension in the
 8  discovery schedule anyway and what really is more
 9  efficient just to deal with now even if at the end of
10  the day the motion to dismiss is granted.  Okay?
11            MS. LEDUC:  And, your Honor, this is Carolyn
12  LeDuc, would you like us to then submit a letter?  What
13  would you like us to do in terms of --
14            THE COURT:  Yes.  I want you to meet and confer
15  on that.  And then I'll look at the calendar and
16  schedule another conference.  And you should submit a
17  joint letter on this issue a week prior to that
18  conference.  And if you have competing proposals, you
19  can just put it in two separate sections.  It doesn't --
20  I'll give you each a chance to, each side a chance to
21  talk at the conference.  Okay?  It's not meant to be a
22  full briefing.
23            MS. LEDUC:  Thank you.
24            THE CLERK:  Judge?
25            THE COURT:  Yes?
```

```
 1                        PROCEEDINGS                    47
 2            THE CLERK:  I just want to remind you you also
 3  have a conference scheduled already for March 29th at
 4  11 a.m.
 5            THE COURT:  Oh, fantastic.  Okay.  Good.  So
 6  everybody has that on their calendar?
 7            THE CLERK:  That's an in-person conference.
 8            THE COURT:  Okay.  Okay, good.  So -- hold on
 9  here; let me just look at the schedule.
10            THE CLERK:  We can extend that for more time
11  that day, as well.
12            (Clerk and Court discuss scheduling time.)
13            THE COURT:  Because what I want to really
14  understand is what are the depositions happening.  I
15  want you all to talk about the schedule for depositions,
16  get some deposition dates out on the calendar.  And each
17  side should think through what are the topics that those
18  witnesses will be dealing with.  And be prepared to
19  discuss all of that at the March conference.  Okay?
20            MS. LEDUC:  Will do.  Thank you, your Honor.
21            THE COURT:  So we'll just --
22            MR. KRATENSTEIN:  Thank you, your Honor.
23            THE COURT:  Just submit the joint letter on
24  that a week in advance of that conference.
25            Okay.  I have another conference, so we have to
```

```
 1                       PROCEEDINGS                    48
 2  adjourn.  And I'll look forward to your letters.  Thank
 3  you.
 4            (Whereupon, the matter is recessed.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

49

C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of Kaiser Aluminum Warrick, LLC v. US Magnesium LLC, Docket #22-cv-03105-JGK-KHP, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature_____*Carole Ludwig*_____

Carole Ludwig

Date:     February 16, 2023