**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────

**KAISER ALUMINUM WARRICK, LLC,**
                              **Plaintiff,**          **22-cv-3105 (JGK)**

          **- against -**                    **MEMORANDUM OPINION**
                                             **AND ORDER**
**US MAGNESIUM, LLC,**
                    **Defendant.**
────────────────────────────────

**JOHN G. KOELTL, District Judge:**

The plaintiff, Kaiser Aluminum Warrick, LLC ("Kaiser")
brought this action against the defendant, US Magnesium, LLC
("US Mag"), seeking to recover compensatory damages and lost
profits after US Mag declared force majeure under the parties'
contract and failed to deliver magnesium for which Kaiser had
contracted. Both parties now cross move for partial summary
judgment. The parties agree that the validity of US Mag's force
majeure declaration presents a question of disputed fact for the
factfinder. However, Kaiser seeks summary judgment dismissing US
Mag's asserted "pass-on" defense, while US Mag seeks summary
judgment dismissing Kaiser's claims for consequential and
incidental damages, thereby preventing Kaiser from recovering
lost profits in addition to compensatory damages. For the
reasons discussed below, Kaiser's motion for partial summary
judgment is **granted** and US Mag's motion for partial summary
judgment is **denied.**

1

**I.**

The following facts are taken from the parties' Local Rule
56.1 statements, counterstatements, and supporting papers and
are undisputed unless otherwise noted.[1]

This dispute arises out of a Magnesium Supply Agreement
("MSA"), effective October 9, 2020, wherein US Mag agreed to
sell magnesium to Kaiser for use in the production of aluminum
sheets for the food and beverage packaging industry. Kaiser 56.1
Statement ¶¶ 1-2, ECF No. 130; Kratenstein Decl., Ex. A ("MSA"),
ECF No. 131. Pursuant to the MSA, US Mag agreed to sell, and
Kaiser agreed to purchase, specified volumes of magnesium within
a minimum and maximum range at fixed prices between December 1,
2020, and December 31, 2022. Kaiser 56.1 Statement ¶ 3; MSA §§
2-3. The MSA also required US Mag to maintain a sixty-day safety
stock of magnesium for Kaiser in case of supply disruption.
Kaiser 56.1 Statement ¶ 4; MSA § 2(d).

Additionally, the MSA contained several provisions
addressing liability. In section 7, titled "Warranty," US Mag
warrants, in part, that all magnesium will be free of defects in
material and workmanship, and sets forth Kaiser's exclusive

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits
all alterations, omissions, emphasis, quotation marks, and
citations in quoted text.

2

remedies for any defective goods. See MSA § 7. Meanwhile,

section 8, titled "Seller's Liability," provides:

> Seller's Liability: Seller's liability with
> respect to this Agreement and the Material
> purchased under it shall not exceed the
> purchase price of the shipment of such
> Material as to which liability arises and
> Seller shall not be liable for any injury,
> loss or damage resulting from the handling or
> use of the materials shipped hereunder whether
> in manufacturing process or otherwise. In no
> event shall Seller be liable for incidental or
> consequential damages.

MSA § 8.

On September 29, 2021, US Mag declared force majeure under

the MSA, claiming that it had suffered catastrophic equipment

failures at its plant. Kaiser 56.1 Statement ¶ 6-7. After

declaring force majeure, US Mag began to deliver reduced

quantities of magnesium to Kaiser. Id. ¶ 9. US Mag also did not

deliver the sixty-day safety stock of magnesium to Kaiser. Id.

¶ 10.[2] Kaiser obtained cover magnesium from other sources on the

open market to compensate for shortfalls in US Mag's production

and satisfy contractual obligations to Kaiser's own customers.

Id. ¶ 11. However, Kaiser paid higher prices for this cover

magnesium than the fixed price it would have paid to US Mag

under the MSA. Id. ¶ 12.

---

[2] US Mag agrees that it did not deliver the safety stock to
Kaiser but disputes that it was obligated to do so. See US Mag's
Response to Kaiser's 56.1 Statement ¶ 10, ECF No. 155.

Kaiser's supply agreements with its own customers each contained commodity price adjustment provisions. Id. ¶ 13. These commodity price adjustment provisions were prospective to the extent that any adjustments were applied to future period's volumes on a per-pound basis and not retroactively to past quantities ordered. Id. ¶ 15. Because of the increase in magnesium costs after US Mag's force majeure declaration, Kaiser renegotiated its customer supply agreements to account for the increased price of magnesium by amending the prospective commodity price adjustment mechanisms "to include a backward-looking reconciliation." See id. ¶¶ 16–18.[3] The parties dispute whether Kaiser's customers agreed to renegotiate in exchange for meaningful consideration. Kaiser asserts that "[c]ustomers agreed to amend their price adjustment mechanisms in exchange for various forms of consideration from Kaiser such as longer contract terms with guaranteed pricing and quantities." Id. ¶ 19. US Mag responds that Kaiser has not presented sufficient evidence of this consideration. See US Mag's Response to Kaiser's 56.1 Statement ¶ 19.

---

[3] US Mag disputes the characterization of the price adjustment mechanism as either backward- or forward-looking. See US Mag's Response to Kaiser's 56.1 Statement ¶ 17. This dispute is not relevant to the resolution of this motion.

On July 7, 2022, Kaiser declared force majeure under its own customer supply agreements. US Mag's 56.1 Statement ¶ 8, ECF No. 136. The reason for Kaiser's declaration of force majeure is disputed. See Kaiser's Response to US Mag's 56.1 Statement ¶¶ 7–10, ECF No. 150. Kaiser lifted its force majeure declaration, approximately two months later, on September 6, 2022. US Mag's 56.1 Statement ¶ 14.

On April 14, 2022, Kaiser brought this action against US Mag, seeking compensatory damages for breach of contract. ECF No. 1. Kaiser filed an Amended Complaint on September 27, 2022, requesting lost profits in addition to compensatory damages, and US Mag moved to dismiss the Amended Complaint. ECF Nos. 43, 48. Principally, US Mag claimed that section 8 of the MSA expressly precluded Kaiser's claim for consequential and incidental damages in the form of lost profits. See ECF No. 49. This Court denied US Mag's motion to dismiss, finding that the MSA provision was ambiguous and that the proper interpretation of the MSA could not be decided on a motion to dismiss, "but must await further developments of the record, including discovery and possible motions for summary judgment." Kaiser Aluminum Warrick, LLC v. US Magnesium LLC, No. 22-cv-3105, 2023 WL 3847367, at *4 (S.D.N.Y. June 6, 2023).

Following discovery, Kaiser moved for partial summary judgment dismissing US Mag's asserted pass-on defense. See ECF

No. 128. US Mag cross-moved for partial summary judgment dismissing Kaiser's claims for consequential and incidental damages. See ECF No. 133. US Mag also contests the admissibility of Kaiser's expert testimony on lost profits.

## II.

The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322—23 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. However, "disputed legal questions . . . present nothing for trial and are appropriately resolved on a motion for summary judgment." Flair Broad. Corp. v. Powers, 733 F. Supp. 179, 184 (S.D.N.Y. 1990).

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the materials in the record that "it believes demonstrate the

absence of a genuine issue of material fact." Celotex, 477 U.S.
at 323. If the movant meets that burden, "the nonmoving party
must come forward with specific facts showing that there is a
genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith
Radio Corp., 475 U.S. 574, 587 (1986) (emphasis omitted). At the
summary judgment stage, the court must resolve all ambiguities
and draw all reasonable inferences against the moving party. See
id. The substantive law governing the case will identify those
facts that are material and, "[o]nly dispute[] over facts that
might affect the outcome of the suit under the governing law
will properly preclude the entry of summary judgment." Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

### III.

First, Kaiser moves for partial summary judgment dismissing
US Mag's asserted pass-on defense. US Mag contends that the cost
of purchasing cover magnesium that Kaiser "passed-on" to its own
customers should be deducted from any total damages award.

Kaiser contends that New York state law precludes US Mag's
invocation of the pass-on defense. The Uniform Commercial Code
("UCC") provides that, after a breach of contract, a buyer "may
'cover' by making in good faith and without unreasonable delay
any reasonable purchase of or contract to purchase goods in
substitution for those due from the seller." N.Y. UCC Law § 2-
712(1) (McKinney). In the event of breach, a buyer of cover

7

goods "may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages . . . but less expenses saved in consequence of the seller's breach." UCC § 2-712(2) (emphasis added). The New York Court of Appeals has held that additional costs of cover goods "passed-on" to the non-breaching party's customers are not "an expense saved as a consequence of the [seller's] breach for which [the seller] is entitled to any credit." Fertico Belg. S.A. v. Phosphate Chems. Export Assoc., Inc., 510 N.E.2d 334, 337 (N.Y. 1987) (citing UCC 2-712(2)).

In Fertico, the defendant failed to deliver contracted-for fertilizer, and the plaintiff was forced to purchase cover fertilizer at a higher price to avoid breaching a contract with one of its customers. Id. at 335-36. The plaintiff's customer agreed to pay a higher price and to accept a later delivery date, in exchange for delivery of the fertilizer to the customer's preferred, inland location. Id. at 336. The New York Court of Appeals held that "[t]he additional compensation" paid to the plaintiff by the plaintiff's customer was not "an expense saved as a consequence of the . . . breach" because it was "not a cost or expenditure anticipated in the absence of a breach." See id. at 337.[4] The court therefore declined to reduce the

---

[4] Separately, the New York Court of Appeals held that (1) the plaintiff could not recover consequential damages for the

damages award by the increased amount received from the
plaintiff's customer. In other words, the Court of Appeals
rejected the argument that the defendant was entitled to a
credit for the additional amount that the plaintiff "passed on"
to its customer.

The Appellate Division of the New York State Supreme Court
has also rejected the pass-on defense and required that damages
be measured from the time of breach.[5] For example, in Orange &
Rockland Utilities, Inc. v. New England Petroleum Corp., the
defendant raised a pass-on defense similar to the one asserted

---

increased transportation costs incurred by the plaintiff to
transport the product to the customer's inland location; and (2)
the plaintiff's eventual sale of the late-delivered fertilizer
did not reduce the damages award because the plaintiff, who was
in the business of selling fertilizer, would have pursued such
commercial transactions absent any breach. See Fertico, 510
N.E.2d at 338. The parties discuss the latter holding in the
briefing but because Kaiser did not sell late-delivered goods to
a third party for a profit, it is not relevant to the issue of
whether Kaiser's damages should be reduced by any increased
amount it received from the customer to whom it sold the cover
magnesium it purchased.

[5] US Mag points out that in cases where the non-breaching party
purchases cover goods, damages are not actually calculated at
the time of breach because any damages must account for "the
difference between the cost of cover and the contract price,"
and the "cost of cover" is not yet known at the time of breach.
See UCC § 2-712(2). Nevertheless, courts have continued to refer
to the "time of breach" rule even in cases involving the
purchase of cover goods and have concluded that "[t]he inquiry
is best ended at the first step—did the party who suffered a
breach pay more for reprocurement of services." Hughes Commc'ns
Galaxy, Inc. v. United States, 38 Fed. Cl. 578, 582 (Fed. Cl.
1997), aff'd, 271 F.3d 1060 (Fed. Cir. 2001)

by US Mag in this case. The Appellate Division, First Department, held that damages are measured "from the time of the breach" and the court "does not inquire into later events." 400 N.Y.S.2d 79, 81 (App. Div. 1977); see also Gray v. Pashkow, 564 N.Y.S.2d 520, 521 (App. Div. 1990) (concluding that "[g]enerally, damages are computed as of the time the contract is breached" and "[a]ny subsequent collateral recovery supplied by a source other than the transgressor does not alter the amount of the breaching party's obligation"); TNT USA, Inc. v. DHL Express (USA), Inc., No. 09-cv-481, 2011 WL 2262492, at *1 (E.D.N.Y. June 7, 2011) (not permitting discovery on the "pass-on defense" because of "New York cases establishing that breach of contract damages are established at the time of breach"); Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 601 N.Y.S.2d 334, 339 (App. Div. 1993).

In 1932, the U.S. Supreme Court also considered and rejected what appears to have been a pass-on defense. See Adams v. Mills, 286 U.S. 397 (1932). In Adams, merchants engaged in buying and selling livestock sued the carriers transporting the livestock, arguing that the carriers had overcharged them. Id. at 405. Although the defendants did not invoke the pass-on defense by name, they contended that the plaintiffs were acting as consignors for third-party shipper consignees and had passed the extra charge on to the shipper consignees. See id. at 406-07

10

(arguing "that individually [the plaintiffs] suffered no
pecuniary loss, since they paid the charges as commission
merchants and reimbursed themselves for these . . . charges from
the proceeds of the sale of live stock, remitting to their
principals only the balance remaining"). The Court rejected the
defense, holding that:

> In contemplation of law the claim for damages
> arose at the time the extra charge was paid.
> Neither the fact of subsequent reimbursement
> by the plaintiffs from funds of the shippers
> nor the disposition which may hereafter be
> made of the damages recovered is of any
> concern to the wrongdoers. This proceeding
> does not involve a controversy between the
> consignors and the consignees; and the
> carriers cannot be allowed to import one into
> it.

Id. at 407. Adams, like Orange & Rockland, instructs courts to
look to "the time the extra charge was paid" and not to any
subsequent reimbursement.

The pass-on defense would also be contrary to New York
public policy. As the court noted in Orange & Rockland, "were a
pass-on defense permitted, a supplier could breach his contract
with impunity because, for lack of substantial pecuniary
interest, no one would be available to bring suit against him."
400 N.Y.S.2d at 82; see also Cobble Hill, 601 N.Y.S.2d at 339
("[A]lthough [the plaintiff] was reimbursed by the State for the
real estate taxes, [the defendant] should not be allowed to
utilize a 'pass-on' defense, since such a defense would allow

those with contracts with Medicaid-funded facilities to breach
their contracts with impunity.").

    Courts in other jurisdictions have discussed the policy
concerns presented by the "pass-on" defense in greater detail.
For example, the Court of Federal Claims has observed that:

> The breaching party is the wrongdoer and
> should not be able to take advantage of such
> arrangements by shifting those costs to third
> parties. Whether the contracting party who
> suffers the breach is getting paid twice for
> its costs is a question best worked out
> between it and its customers.

Hughes Commc'ns Galaxy, Inc. v. United States, 38 Fed. Cl. 578,
581 (Fed. Cl. 1997), aff'd, 271 F.3d 1060 (Fed. Cir. 2001).
Similarly, the Arizona Court of Appeals has declined to allow a
"pass-on" defense because:

> If [the defendant] were permitted to assert
> [the pass-on] defense against [the plaintiff],
> it would be able to retain its overcharges
> with impunity. Since [the plaintiff's]
> customers, the parties who ultimately absorbed
> at least some part of the damage, were not in
> privity with [the defendant], they cannot sue
> on the contract. . . . [The plaintiff] is the
> only party that can recover the overcharge
> from [the defendant], and it will be permitted
> to do so.

N. Ariz. Gas Serv., Inc. v. Petrolane Transp., Inc., 702 P.2d
696, 705 (Ariz. App. 1984).

    US Mag contends that the time of breach rule outlined by
Kaiser and supported by Orange & Rockland does not apply to
these facts. Instead, US Mag asserts, the rule has its origins

in cases involving the conversion of currency or the valuation of assets and securities. See, e.g., Hoppe v. Russo-Asiatic Bank, 138 N.E. 497, 498 (N.Y. 1923) (holding that the applicable exchange rate was the one in place at the time of the breach of contract, not the one in place at the time of judgment). US Mag contends that the time of breach rule has been invoked mistakenly in cases where the non-breaching party passes on costs associated with the breach. However, in the absence of any case endorsing the pass-on defense, this Court is bound by the controlling authority of the New York state courts.

US Mag also cites Inchaustegui v. 666 5th Ave. Ltd. Partnership, 749 N.E.2d 196, 197-98 (N.Y. 2001), in support of its argument that the New York Court of Appeals has rejected the time of breach rule. In that case, the New York Court of Appeals considered whether, under New York's collateral source rule, an insurance recovery could reduce breach of contract damages. The court concluded that the collateral source rule did not apply, and that the insurance recovery could reduce the damages award because "the common-law collateral source rule is inherently a tort concept" and "has a punitive dimension that does not comport with contract law." Id. at 198, 200. However, the court

13

only considered the scope of the collateral source rule and did not address the validity of the pass-on defense more generally.

Moreover, various state and federal courts have limited Inchaustegui's holding to cases where a party has been compensated by its own insurance. See, e.g., U.S. Bank Nat'l Ass'n v. Dexia Real Est. Cap. Mkts., No. 12-cv-9412, 2016 WL 6996176, at *6 (S.D.N.Y. Nov. 30, 2016) ("New York courts have explicitly limited Inchaustegui to cases in which a party has been compensated by its own insurance, and therefore sustained no loss beyond its out-of-pocket costs."); Murray v. N.Y.C. Transit Auth., 862 N.Y.S.2d 706, 708 (App. Term 2008) ("Inchaustegui is limited in its application to those cases where a party has obtained its own insurance."); 515 Ave. I Corp. v. 515 Ave. I Tenants Corp., No. 65/05, 2010 WL 4904671, at *8 (N.Y. Sup. Ct. 2010) ("Inchaustegui has not been applied in any published decision in any context other than breach of an insurance provision."). Because this case does not involve insurance, Inchaustegui is plainly inapplicable.

Finally, there is no basis to allow US Mag to invoke a pass-on defense in this case. Kaiser's customers and US Mag are not in contractual privity and therefore, Kaiser's customers could not sue US Mag for breach of contract to recover the increased cost of cover directly. As courts in New York and other jurisdictions have noted, allowing the pass-on defense

14

would permit US Mag to breach its contract with Kaiser with impunity, secure in the knowledge that no plaintiff can hold it accountable. See, e.g., N. Ariz., 702 P.2d at 704-05; see also Cobble Hill, 601 N.Y.S.2d at 339.

Accordingly, Kaiser's motion for summary judgment striking the defendant's asserted pass-on defense is **granted.** The Court need not reach Kaiser's argument regarding the collateral source rule.

## IV.

US Mag moves for partial summary judgment striking Kaiser's claim for lost profits, asserting that: (1) section 8 of the MSA precludes recovery of consequential damages—including lost profits;[6] and (2) Kaiser's expert's report on lost profits should be excluded because it did not use reliable methodology and is likely to confuse or prejudice the jury.

## A.

The parties' dispute centers on section 8 of the MSA, which provides that:

> Seller's Liability: Seller's liability with respect to this Agreement and the Material purchased under it shall not exceed the purchase price of the shipment of such Material as to which liability arises and Seller shall not be liable for any injury,

---

[6] Lost profits are the quintessential consequential damages. See, e.g., Schonfeld v. Hilliard, 218 F.3d 164, 176 (2d Cir. 2000) ("The type of consequential damages most often sought is lost operating profits of a business.")

> loss or damage resulting from the handling or
> use of the materials shipped hereunder whether
> in manufacturing process or otherwise. In no
> event shall Seller be liable for incidental or
> consequential damages.

MSA § 8.

Under New York law, if "a contract is straightforward and unambiguous, its interpretation presents a question of law for the court" and summary judgment is appropriate. Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005). By contrast, "[w]hen the provisions of the contract are susceptible to conflicting constructions and when there is also relevant extrinsic evidence of the parties' actual intent, the meaning of the provisions becomes an issue of fact barring summary judgment." Williams & Sons Erectors, Inc. v. S.C. Steel Corp., 983 F.2d 1176, 1183 (2d Cir. 1993); see also Mellon Bank, N.A. v. United Bank Corp. of N.Y., 31 F.3d 113, 116 (2d Cir. 1994) ("[A]mbiguity itself is not enough to preclude summary judgment. Rather, in order for the parties' intent to become an issue of fact barring summary judgment, there must also exist relevant extrinsic evidence of the parties' actual intent."). However, "[a]mbiguity without the existence of extrinsic evidence of intent presents not an issue of fact, but an issue of law for the court to rule on." Williams & Sons, 983 F.2d at 1184; see also Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 232 F.3d 153, 158

16

(2d Cir. 2000) ("A court may also grant summary judgment regarding the interpretation of ambiguous language if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language.").

This Court previously denied US Mag's motion to dismiss Kaiser's claim for lost profits, finding that the contract language was ambiguous, and that interpretation of the provision should "await further developments of the record, including discovery and possible motions for summary judgment." Kaiser, 2023 WL 3847367, at *4. During discovery, the parties uncovered no material extrinsic evidence to shed light on the meaning of the contested provision. Accordingly, the parties now agree that the interpretation of section 8 of the MSA presents "an issue of law for the court to rule on." William & Sons, 983 F.2d at 1184.

Contractual limitations on liability "must be clearly, explicitly and unambiguously expressed" to be enforceable. Terminal Cent., Inc. v. Henry Modell & Co., Inc., 628 N.Y.S.2d 56, 59 (App. Div. 1995); 1861 Cap. Master Fund, LP v. Wachovia Cap. Mkts., LLC, 944 N.Y.S.2d 121, 123 (App. Div. 2012) (finding that the contract did not "clearly, explicitly and unambiguously" exclude the lost profit damages sought); Zoller v. Niagra Mohawk Power Corp., 525 N.Y.S.2d 364, 367 (App. Div. 1988) ("[E]xculpatory clauses should be strictly construed against the person seeking exemption from liability."); see also

Abernathy-Thomas Eng'g Co. v. Pall Corp., 103 F. Supp. 2d 582, 605 (E.D.N.Y. 2000); Ruiz v. Force Servs., LLC, No. 16-cv-6729, 2019 WL 13524220, at *2 (S.D.N.Y. Aug. 2, 2019).

As this Court already held, section 8's language is ambiguous, see Kaiser, 2023 WL 3847367, at *4, and should therefore be construed strictly. US Mag cites language in section 8 of the MSA providing that "[i]n no event shall Seller be liable for incidental or consequential damages." Kaiser responds that it may recover lost profits because section 8 only limits liability for materials purchased and shipped under the MSA and that the magnesium at issue in this case was never shipped.

US Mag points to several cases from this District analyzing similar contract provisions. See World-Link, Inc. v. Citizens Telecomms. Co., No. 99-cv-3054, 2000 WL 1877065, at *1-3 (S.D.N.Y. Dec. 26, 2000); Mayor v. Jean Philippe Fragrances, Inc., No. 92-cv-6217, 1994 WL 9684, at *5 (S.D.N.Y. Jan. 10, 1994). In those cases, the courts considered contract language that broadly precluded consequential damages. See World-Link, 2000 WL 1877065, at *1; Mayor, 1994 WL 9684, at *5. In both cases, the plaintiffs contended that the provisions precluded consequential damages only in the specific contexts otherwise addressed in those provisions: respectively, (1) interruptions of telecommunication service and (2) product warranties. See

18

World-Link, 2000 WL 1877065, at *1; Mayor, 1994 WL 9684, at *5.
Nevertheless, the courts in both cases held that the plaintiffs
could not recover consequential damages. See World-Link, 2000 WL
1877065, at *1; Mayor, 1994 WL 9684, at *5

However, another court in this District subsequently
distinguished Mayor on the ground that, in that case, "the
contract contained language that was clearly intended to apply
to situations beyond the limited area of product warranties."
See Sunoco Overseas, Inc. v. Texaco Int'l Trader, Inc., 69 F.
Supp. 2d 502, 509 n.6 (S.D.N.Y. 1999).[7] By contrast, the court in
Sunoco declined to decontextualize a single sentence providing
that "[n]either party will be liable for special, consequential
or incidental damages," and noted that the surrounding sentences
specifically referred to "defects in quality or shortage[s] in
quantity of the product." See id. at 509. Accordingly, the court
held that the contested language could not be read to "appl[y]
to consequential damages of any kind." See id.

Section 8's language providing that "[i]n no event shall
Seller be liable for incidental or consequential damages,"
should not be read without the context of the paragraph in which
it appears. Section 8 addresses liability with respect to "this

---

[7] Although Sunoco involved a petition to confirm an arbitration
award and was subject to a different standard of review,
Sunoco's reasoning is persuasive.

Agreement <u>and the Material purchased under it</u>." MSA § 8
(emphasis added). The sentence preceding the disputed language
refers to "loss or damage resulting from the handling or use of
the <u>materials shipped hereunder</u>." <u>Id.</u> (emphasis added).
Moreover, the first sentence of section 8 appears to predicate
liability on the shipment of materials pursuant to the contract.
<u>See</u> <u>id.</u> (providing that "Seller's liability with respect to this
Agreement and the Material purchased under it shall not exceed
the purchase price of <u>the shipment of such Material as to which</u>
<u>liability arises</u>" (emphasis added)).

　　　US Mag responds that limiting section 8 to magnesium
shipped to Kaiser would render other provisions of the MSA
superfluous. Section 7 of the MSA provides that in the event US
Mag breaches its warranty that the product will be free from
defects, Kaiser's exclusive remedies are the remedies granted in
section 6 of the MSA. MSA § 7. Meanwhile, section 6 provides
remedies such as the return of nonconforming products "for
reimbursement, credit, replacement, or repair." MSA § 6.
However, contrary to US Mag's contention, Kaiser's reading of
section 8 would not render sections 6 and 7 superfluous because
section 8 is broader than sections 6 and 7 and covers any
liability related to products purchased and shipped, even where
the product has not breached US Mag's warranties or been
rejected by Kaiser.

Accordingly, although ambiguous, the more persuasive reading of the disputed contract language permits consequential damages—including lost profits—where the material at issue was never shipped. This conclusion also best accords with New York cases cautioning that contractual limitations on liability ought to be unambiguously expressed and construed strictly. See, e.g., Terminal Cent., 628 N.Y.S.2d at 59; Zoller, 525 N.Y.S.2d at 367. Accordingly, US Mag's motion for summary judgment striking Kaiser's claim for lost profits is **denied**.[8]

### B.

Finally, US Mag contends that the report by Kaiser's expert (the "Casey Report") on the amount of Kaiser's lost profits is not reliable and should be excluded pursuant to Federal Rules of Evidence ("FRE") 403 and 702. Kaiser's expert—Craig Casey ("Casey")—is a partner at an audit, tax, and advisory firm, in the forensic advisory services division. Asher Decl., Ex. E ("Casey Report") at 1. He is a Certified Public Account, holds an MBA in Accounting, and has over thirty years of experience in

---

[8] It is unnecessary to reach Kaiser's alternative argument that US Mag is estopped from relying on the alleged preclusion of consequential damages because US Mag declared force majeure in bad faith.

providing accounting, litigation, and dispute consulting services. Id.[9]

FRE 702 governs the admissibility of expert and other scientific or technical expert testimony. The Supreme Court has clarified that district courts have a "gatekeeping function" under FRE 702 and are "charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993)). In assessing reliability, district courts look to "the indicia of reliability identified in [FRE] 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." Clerveaux v. E. Ramapo Cent. Sch. Dist., 984 F.3d 213, 233 (2d Cir. 2021).

Moreover, "because the federal rules emphasize liberalizing expert testimony, doubts about whether an expert's testimony will be useful should generally be resolved in favor of

---

[9] Although styled as a motion to exclude the Casey Report, US Mag's motion is actually a motion to preclude Casey as an expert witness because Casey's Report is unlikely to be admitted as evidence at trial given that it is hearsay, but Kaiser would likely call Casey as an expert witness at trial.

admissibility unless there are strong factors such as time or surprise favoring exclusions." United States v. Jakobetz, 955 F.2d 786, 797 (2d Cir. 1992); Lickteig v. Cerberus Cap. Mgmt., L.P., 589 F. Supp. 3d 302, 330 (S.D.N.Y. 2022) ("In light of the liberal admissibility standards of the Federal Rules of Evidence, exclusion of expert testimony is warranted only when the district court finds serious flaws in reasoning or methodology."). If an expert's testimony "falls within 'the range where experts might reasonably differ,' the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court." Id. (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 153 (1999)).

In addition to FRE 702, US Mag calls for exclusion pursuant to FRE 403. Testimony deemed admissible under FRE 702 may nevertheless be inadmissible under FRE 403, which authorizes the exclusion of relevant evidence where the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. See Nimely v. City of N.Y., 414 F.3d 381, 397 (2d Cir. 2005). "The trial court has broad discretion in determining whether proffered evidence should be admitted, and in general in the absence of a significant showing of unfair prejudice, evidence with substantial probative value should not be excluded."

Martell v. Boardwalk Enters., Inc., 748 F.2d 740, 747 (2d Cir. 1984). However, the Supreme Court has noted that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." Daubert, 509 U.S. at 595.

US Mag contends that Casey has failed to establish a causal relationship between US Mag's declaration of force majeure and Kaiser's lost sales, and that this failure renders the Casey Report unreliable. US Mag argues that portions of the Casey Report should therefore be excluded under FRE 702 and 403.

Contrary to US Mag's contention, the Casey Report satisfies the standards for FRE 702 and 403. Kaiser's expert clearly explained his methodology: he compared Kaiser's forecasted sales to its actual sales for the relevant period. Asher Decl., Ex. E (the "Casey Report") at 30-31. Moreover, the forecasted sales are not mere predictions, but instead "include actual[] [sales] through the prior month, customer orders for the current month and the next two months, and a projection for the remaining months within a given year." Id. at 31 n.72. The Casey Report calculated that Kaiser's historical sales results were, on average, within 1.8% of its forecasted amounts and therefore adjusted the forecasted amounts downward by 1.8% to account for

24

variance. Id. at 33. The expert also considered other possible explanations for lost profits and adjusted for certain of those possibilities—for example, excluding lost profits from the fourth quarter because of a general decline in the aluminum market in that quarter. Id. at 31-32.

All told, the expert testimony appears to be "grounded on sufficient facts or data" and to be "the product of reliable principles and methods." Clerveaux, 984 F.3d at 233. It is also not substantially likely to mislead the jury or confuse the issues under the standard for FRE 403. Moreover, US Mag will have the opportunity to cast doubt on Casey's methods and conclusions during cross examination at trial. See Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); DoubleLine Cap. LP v. Odebrecht Fin., Ltd., No. 17-cv-4576, 2024 WL 1115944, at *6 (S.D.N.Y. Mar. 14, 2024) ("[I]n a close case, a court should permit the testimony to be presented at trial, where it can be tested by cross-examination and measured against the other evidence in the case.").

Accordingly, US Mag's motion to exclude Kaiser's expert report on lost profits is **denied.**

**CONCLUSION**

The Court has considered all of the parties' arguments. To the extent not specifically addressed, those arguments are either moot or without merit. For the foregoing reasons, Kaiser's motion for partial summary judgment is **granted** and US Mag's motion for partial summary judgment is **denied**. The Clerk is directed to close ECF Nos. 128 and 133.


**SO ORDERED.**
**Dated:**    **New York, New York**
             **February 12, 2025**

                                    _____
                                         John G. Koeltl
                                 **United States District Judge**

26